EDM & ASSOCIATES, INC., Appellant,

v.

GEM CELLULAR, et al., Appellees.

No. 89–728.

District of Columbia Court of Appeals.

Argued Feb. 28, 1991.
Decided Oct. 1, 1991.

Richard T. Tomar, with whom Kathleen McTeague, Washington, D.C., was on the brief, for appellant.

Hadrian R. Katz, with whom Kathleen M.H. Wallman, Washington, D.C., was on the brief, for appellees GEM Cellular and George E. Murray.

R. Bruce Beckner, Washington, D.C., for appellee Metro Mobile CTS, Inc.

Before FERREN and SCHWELB, Associate Judges, and PRYOR, Senior Judge.

SCHWELB, Associate Judge:

I

This appeal requires us to explore the world of "state of the art" cellular telephones, as well as some astonishingly informal and free-wheeling alleged dealings among entrepreneurs who were competing for the substantial profits which these devices can generate. Appellant EDM & Associates, Inc. is a closely held corporation controlled by its president, Early D. Monroe, Jr., who owns almost all of its stock. Appellee GEM Cellular (GEM) is a sole proprietorship of appellee George E. Murray.[1] Appellee Metro Mobile CTS, Inc. (Metro Mobile) is a corporation. The controversy in this case has its inception in the efforts of each of these three businesses to obtain from the Federal Communication Commission (FCC) a cellular telephone construction permit for the New London, Connecticut area.

Prior to 1984, the FCC selected cellular licensees by holding hearings regarding their comparative qualifications. In that year, the Commission inaugurated a system of random selection by lottery. *See* Cellular Radio Service (Lottery Section), 101 FCC2d 577 (1985). In 1986, GEM won the lottery conducted by the FCC and thus became the tentative recipient for the New London permit.

Under the applicable FCC Regulation, *see* 47 C.F.R. § 22.917(b) (1986), GEM was then required to demonstrate its financial capacity to construct the proposed cellular system, and to operate it for one year, by obtaining a "firm financial commitment letter." EDM alleged that GEM was unable, without EDM's help, to obtain such a commitment letter within the time provided by the Commission. EDM further claimed that, pursuant to an oral contract with the GEM defendants, EDM secured the necessary financial commitment letter for GEM from Motorola, Inc. In return for securing that letter and for "various other services, administrative fees, and application expenses," according to EDM, the GEM defendants orally agreed to assign EDM a 49% interest in that permit. The alleged oral agreement further provided, as an alternative means of compensation (hereinafter the second alternative) that if EDM could not lawfully own a 49% share of the permit, then the GEM defendants would be required to pay EDM in an amount for its services which, according to EDM's subsequent invoice, exceeded 6.2 million dollars.[2] EDM claimed that after the FCC granted the license to GEM, the GEM defendants breached the oral contract and engaged in tortious conduct against EDM[3] by refusing either to assign EDM a 49% share in the permit or to compensate it for its services pursuant to the second alternative. EDM further alleged that Metro Mobile intentionally and tortiously interfered with EDM's contractual rights by subsequently

---

1. GEM and Murray are collectively referred to as the GEM defendants.

2. In that invoice, EDM claimed $2,850,000 for securing the New London commitment letter. EDM sought a further $2,850,000 for "failure to deliver a firm financial commitment letter in connection with an apparently unrelated project in West Virginia." The remaining half million

dollars or so in the invoice represented a variety of other alleged expenses and services.

3. In addition to breach of contract, EDM's allegations against the GEM defendants included fraud, negligent misrepresentation, promissory estoppel, malicious breach of fiduciary duty and civil conspiracy.

purchasing GEM's permit for 8.9 million dollars.[4]

Following numerous motions and extensive discovery,[5] the trial judge granted the motions of both defendants for summary judgment dismissing the complaint. The judge ruled that the alleged oral contract to assign to EDM a 49% share of GEM's permit was "plainly in violation" of the FCC's "one percent rule," which provides in pertinent part that

[n]o party may have an ownership interest, direct or indirect, in more than one application for the same MSA.... market, except that interests of less than one percent will not be considered [to be such an interest].

47 C.F.R. § 22.921(b)(1) (1986). He further held, with little elaboration, that the illegality of the provision granting EDM a 49% share carried over to the second alternative of payment of direct compensation. The judge additionally held that EDM had failed to present any triable issue of material fact with respect to its various tort claims against the GEM defendants, and that as to these claims the defendants were therefore entitled to summary judgment as a matter of law.

On appeal, EDM contends that the trial judge erred in holding that the provision of the alleged oral contract giving EDM a 49% interest in the permit was illegal; that even if that provision was illegal, the second alternative was valid; and that the judge incorrectly applied Super.Ct.Civ.Rules 12–I(k) and 56(e), as well as the applicable case law, in granting summary judgment. We agree with the trial judge with respect to the first and third issues. We hold, however, that the invalidity of the alleged agreement to transfer a 49% interest to EDM did not carry over to the second alternative of monetary compensation for services allegedly rendered. Accordingly, we affirm the order granting summary judgment in favor of Metro Mobile,[6] vacate in part the order granting summary judgment to the GEM defendants, and remand the case for further proceedings consistent with this opinion.

## II

EDM contends that its alleged oral agreement with GEM did not violate the one percent rule. According to EDM, that rule was designed only to ensure fairness in the lottery process. EDM claims that the alleged contract was negotiated after the lottery had been completed, and that the one percent rule therefore has no application.

EDM also argues that under the terms of the alleged oral contract, it was entitled to an interest only in the construction permit, but no interest in the application. Since EDM's interest in the application filed by EDM Cellular (but controlled by Monroe) terminated when GEM was awarded the permit, and since EDM's interest in GEM's venture was purportedly only in the permit but not in the application, EDM claims that the two interests did not exist at the same

---

**4.** EDM also charged Metro Mobile with tortious interference with prospective economic advantage and with civil conspiracy.

**5.** The GEM defendants have characterized EDM's allegation that there was an oral agreement between the parties as a fabrication, and point to numerous alleged inconsistencies in Mr. Monroe's various accounts. A contract which allegedly entitled EDM to compensation worth millions of dollars, but which was never reduced to writing, might strike one as somewhat unusual, and the trial judge remarked at one point that "I can't imagine a fact finder crediting Mr. Monroe." The GEM defendants concede, however, that in these appeals from orders granting summary judgment, the truth or falsity of Mr. Monroe's representations is not before us. Their attacks on his credibility, while perhaps central to any proceedings on remand in the trial court, are therefore irrelevant for present purposes.

In the trial court, the GEM defendants also interposed a defense based on the statute of frauds. The trial judge held, however, that there were "material issues of fact" which precluded entry of summary judgment with respect to that defense. Order of May 27, 1989 at 16 n. 5. That ruling is not challenged on this appeal.

**6.** It is not claimed that Metro Mobile could do or did anything to prevent the GEM defendants from complying with the "second alternative" by paying EDM compensation for its services. The tortious interference claim logically relates only to EDM's alleged right to a 49% interest in GEM's permit.

time, so that the one percent rule was not transgressed.

■ Although EDM's contentions in this regard have been expertly briefed and argued, we find them unpersuasive. The one percent rule by its terms proscribes interests in more than one application, not in more than one participant in the lottery. As long as an application remains pending, the plain language of the one percent rule applies, regardless of whether or not a lottery has already been conducted. The controlling question, therefore, is whether the alleged oral agreement gave EDM an interest in GEM's application as that term is used in the one percent rule.

It is undisputed that the alleged oral contract was negotiated before the license had been awarded to GEM. In fact, the purpose of the purported arrangement was supposed to be to enable GEM to secure the firm financial commitment which would enable it to avail itself of its success at the lottery. It is the essence of EDM's position that, but for the commitment letter which EDM allegedly obtained for GEM from Motorola, Inc., GEM would never have received the permit. The service which EDM claims to have rendered was thus plainly performed, if at all, while GEM was still an applicant, and before it became a licensee.

Accordingly, we think that the most reasonable conclusion from these facts—perhaps, indeed, the *only* reasonable conclusion—is that GEM's application was still pending at the time of the alleged agreement. If GEM were determined to be financially ineligible, then one of the other applicants would have been selected to construct the proposed cellular system. The

applications of GEM's competitors therefore remained pending too.[7]

But, says EDM, it never owned any part of GEM's application; its interest was to become effective only if a construction permit were granted to GEM. We do not believe that this contention can withstand critical scrutiny. At the time of the alleged agreement, GEM did not own a permit. All that it had, and all that it could assign, was an interest in the application, which interest had the potential of ripening into a 49% share of the permit. Its future interest in a possible permit was nothing more or less than a present interest in the unapproved application.[8] It is significant that, at a time that GEM Cellular was still an applicant, Mr. Monroe would have been in a position to "root" for a victory for either EDM Cellular or GEM. In a practical sense, he had an interest in both applications. This is the very kind of situation which the one percent rule was intended to prevent.

■ If the one percent rule were to be construed as EDM suggests, then an applicant could circumvent its proscriptions simply by purchasing a share of a competitor's application and by denominating it as a "future" or "contingent" interest in a possible permit. But labels are not controlling. The purpose of the one percent rule is apparent from its text; it is a remedial regulation designed to interdict anticompetitive practices, and it must be construed accordingly. *See, generally, Tenants of 738 Longfellow Street, N.W. v. District of Columbia Rental Hous. Comm'n*, 575 A.2d 1205, 1211 (D.C.1990) (remedial statute must be accorded a generous construction to achieve its purposes). As the court stated in *United States v. Beach Associ-*

---

7. Metro Mobile cites several FCC regulations and rulings which explicitly state that the application process continues until an award has become final. *See, e.g.,* 47 C.F.R. § 1.65(a) (1989), which provides that "[f]or purposes of this section, an application is 'pending' before the Commission ... from the time it is accepted for filing by the Commission until a Commission grant or denial of the application is no longer subject to reconsideration by the Commission or review by any court." This regulation was, however, issued after the alleged oral contract in this case became final. In light of

our disposition, we need not address the question whether it should be construed to apply to the present facts.

8. It is significant, though perhaps not conclusive, that Mr. Monroe effectively acknowledged under oath that EDM owned an undisclosed interest in GEM. He also treated what he said was his 49% interest in GEM's license as a present interest; indeed, he expressed interest in selling it.

*ates, Inc.,* 286 F.Supp. 801, 807 (D.Md. 1968),

> [c]ourts deal with the substance, rather than the form of transactions, and will not permit important legislative policies to be defeated by artifices affecting legal title but not the practical consequences of the existing situation.[9]

FCC regulations have the force and effect of law. *Red River Broadcasting Co. v. Federal Communications Comm'n,* 69 U.S.App.D.C. 1, 3, 98 F.2d 282, 285, *cert. denied,* 305 U.S. 625, 59 S.Ct. 86, 83 L.Ed. 400 (1938). Where, as here, a regulation is legislative in character, the rules of construction applicable to statutes should be used in determining its meaning. 1A N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 31.06, at 532–34 & n. 3 (4th ed. 1985 & 1991 Cum.Supp.). This principle has been specifically applied to regulations promulgated by the FCC. *KCMC, Inc. v. Federal Communications Comm'n,* 600 F.2d 546, 549 (5th Cir.1979) (citing SUTHERLAND). Remedial measures should be construed to foreclose "sophisticated as well as simple-minded modes of nullification or evasion." *Goodman v. District of Columbia Rental Hous. Comm'n,* 573 A.2d 1293, 1297 (D.C.1990). EDM's reading of the one percent rule cannot be reconciled with the teachings of these authorities.

The parties have not brought to our attention any FCC decision which deals explicitly with the post-lottery situation which we confront here. The Commission has stated, however, that an option agreement granting one applicant the right to obtain a 49% interest in a second applicant's completed system, in the event that the second

applicant were granted a construction permit, would violate the one percent rule. Public Notice, Report No. CL–86–148A (May 22, 1986). We perceive no distinction in principle between that situation and the present one. *See also* Public Notice, *Guidelines for Settlements and Changes in Ownership of Cellular Systems,* Report No. CL–86–99 (Mar. 24, 1986) [10] ("[t]he tentative selectee ... may reach agreements, after the lottery, with other applicants *whereby those applicants dismiss their applications* and obtain an interest in the tentative selectee's application") (emphasis added).

Accordingly, we hold that EDM's claim of a 49% interest in GEM's license is repugnant to the one percent rule, and its claim against the GEM defendants for breach of that provision therefore fails for illegality. *William J. Davis, Inc. v. Slade,* 271 A.2d 412, 414 (D.C.1970). EDM's complaint against Metro Mobile also fails, for an action for interference with contractual relations will lie only if the contract allegedly interfered with is a lawful one. WILLIAM L. PROSSER & W. PAGE KEETON, THE LAW OF TORTS, § 129, at 994 (5th ed. 1984). "An essential element of the tort of inducement of breach of contract is the existence of a valid contract." *Nifty Foods Corp. v. Great Atl. & Pac. Tea Co.,* 614 F.2d 832, 837 (2d Cir.1980).[11]

### III

The GEM defendants claim, and the trial judge held, that the illegality of the alleged assignment to EDM of a 49% share of GEM's interest also invalidated the alternative provision for the payment

---

9. The court cited, among other authorities, *Knetsch v. United States,* 364 U.S. 361, 365–66, 81 S.Ct. 132, 135, 5 L.Ed.2d 128 (1960); *United States v. Reading Co.,* 253 U.S. 26, 62, 40 S.Ct. 425, 434, 64 L.Ed. 760 (1920); and *Chicago, M. & St. Paul R.R. Co. v. Minneapolis Civic & Commerce Ass'n,* 247 U.S. 490, 501, 38 S.Ct. 553, 557, 62 L.Ed. 1229 (1918).

10. This notice was issued two months before GEM won the lottery.

11. By the same token, the invalidity of the alleged agreement to give the GEM defendants a 49% share of the license dooms EDM's claims

against Metro Mobile for interference with economic advantage and civil conspiracy. The claimed "economic advantage" with which Metro Mobile is alleged to have interfered derives in its entirety from EDM's purported rights pursuant to an unlawful contract. If such a contract will not support EDM's action, then alleged derivative economic advantages from the contract are likewise insufficient. Similarly, a civil "conspiracy" to deprive EDM of "rights" cannot be actionable if those "rights" flow from an illegal agreement.

of monetary compensation for services allegedly rendered by EDM. If we were to accept this argument, then even if the oral contract existed as EDM has alleged, and even if EDM fully performed its obligations pursuant to it, the GEM defendants would not be required to compensate EDM at all. GEM, in other words, would receive valuable services for nothing. These defendants assert that this result is compelled by what their counsel ominously described at argument as a "harsh jurisprudence." But forfeitures are not favored, *Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195, 203 (D.C.1991), and the applicable authorities, which can more accurately be characterized as just and equitable than as harsh, do not support the GEM defendants' position.

We note at the outset that there is no claim here that either the consideration flowing from EDM (namely, the alleged securing of a financial commitment letter) or the means by which EDM was to be compensated pursuant to the second alternative (namely, the payment of money) was unlawful or contrary to public policy. Moreover, if EDM's allegations regarding the character of the purported oral agreement are credited, then the parties never contemplated that anyone would do anything contrary to law. The transfer of the 49% interest was to occur only if such a transaction were lawful; if it were not, then, the parties were to proceed according to the second alternative. *See Wicks v. Comves*, 110 Tex. 532, 221 S.W. 938 (1920), discussed *infra* at pages 390–91. In spite of this, the GEM defendants claim that the invalidity of the alleged conditional agreement to grant EDM a 49% interest, which was to be pursued only if it was lawful, nevertheless doomed the alternative arrangement, which contemplated a legally unexceptionable form of compensation for altogether legitimate services. We do not agree.

According to Professor Williston, "where one of two things is promised in the alternative, and one is lawful and the other unlawful, the lawful promise may be enforced." 15 SAMUEL WILLISTON, A TREATISE ON THE LAW OF CONTRACTS, § 1779, at 326 and authorities cited at n. 3 (Jaeger 3d ed. 1972 & 1991 Cum.Supp.). Professor Corbin has written that

> if a lawful consideration is given for two promises, one of which is lawful and the other unlawful, the lawful promise is enforceable. There are many cases in which such a rule is stated and applied. Usually in these cases the consideration has been executed in full; and there is no injustice to the defendant in permitting the plaintiff to abandon the illegal promise and to enforce the other one. The defendant receives everything for which he bargained and gives less in return. In reaching the result, it is immaterial whether we regard the case as a single promise of two separate performances or as two promises of separate performances, given for a single consideration; but the performances promised must be separate and distinct. The bargain itself is not divisible, either in terms or in intention; but enforcement can be limited to one performance only without harm to the public or injustice to the defendant.
>
> In like manner, *a promise for a lawful consideration to render one of two performances in the alternative can be enforced as to the lawful alternative even though the other is unlawful.*

6A ARTHUR L. CORBIN, CORBIN ON CONTRACTS, § 1522, at 760–61 (1962 & 1991 Supp.) (emphasis added, footnotes omitted).

The case law, both in the District and in other common law jurisdictions, is consistent with what Professors Williston and Corbin have written. As the Supreme Court of the District of Columbia stated more than a century ago,

> [if] a man receives money which is a legal consideration, and for that consideration promises to do two things, one legal and the other illegal, as, for instance, to pay the principal debt with legal interest, which would be legal, and also to pay a bonus, which would be illegal, there is no reason why he should not be compelled to carry out that part of his agreement which is legal and for which he has received full consideration and more than

a full consideration. But if the promise to do two things—one illegal—is not given for money or other value received, but in consideration of another executory promise, such as a promise to give further time, this latter cannot be enforced by reason of the partial illegality of the promise which was its consideration. In other words the legal part of an undertaking can be enforced if the consideration for it is entirely legal, but an undertaking is void if any part of its consideration is illegal.

*Green v. Lake,* 13 D.C. (2 Mackey) 162, 181–82 (1882). Sixteen years after *Green,* the Supreme Court of the United States likewise held that "[w]hen ... for a legal consideration, a party undertakes to do one or more acts, and some of them are unlawful, the contract is good for so much as is lawful and void for the residue." *McCullough v. Virginia,* 172 U.S. 102, 114, 19 S.Ct. 134, 138, 43 L.Ed. 382 (1898) (citation and internal quotation marks omitted). *Accord, Daniels v. Tearney,* 102 U.S. 415, 419–20, 26 L.Ed. 187 (1880); *United States v. Bradley,* 35 U.S. (10 Peters) 343, 360–63, 9 L.Ed. 448 (1836).

"A lawful promise made for a lawful consideration is not invalid by reason only of an unlawful promise made at the same time and for the same consideration." *Central N.Y. Tel. & Tel. Co. v. Averill,* 199 N.Y. 128, 140, 92 N.E. 206, 210 (1910) (citation and internal quotation marks omitted); *see also Murray Walter, Inc. v. Sarkisian Bros., Inc.,* 107 A.D.2d 173, 177, 486 N.Y.S.2d 396, 399 (3d Dept.1985). In *Kessler v. Jefferson Storage Corp.,* 125 F.2d 108 (6th Cir.1941), the court, after stating the above principle, explained one reason for it:

> If the obnoxious feature of a contract can be eliminated, without impairing its symmetry as a whole, the courts will be inclined to adopt this view as the one most likely to express the intention of the parties.

*Id.* at 111.

In most or all of the foregoing cases, the defendant had, for a valid consideration, agreed to do both a lawful act and an unlawful one. Here, GEM allegedly promised to compensate EDM in one of two different ways, rather than by performing both alternatives. As both Professor Williston and Professor Corbin have explicitly noted, however, see page 389, *supra,* the result under these circumstances is the same. Indeed, the reasons for applying the doctrine of the cited cases in the present situation are even more compelling, for under the second alternative of the alleged contract between EDM and the GEM defendants, the entire consideration contemplated by and flowing from both parties was lawful.

In *Wicks, supra,* a lease of a fruit stand provided that the stand would be located on the sidewalk outside the landlord's building, but that if the maintenance of a stand at that location should be or become illegal, then the tenant would have the right to utilize the inside of the landlord's premises. In fact, the use of the sidewalk for the fruit stand was prohibited by a municipal ordinance. Rejecting the landlord's argument that the promise of inside space was also void, the court stated that

> the ordinance, as then in force, made it impossible for the fruit stand to remain on the outside or to project over or to occupy the sidewalk; and hence from the instant the contract was executed the obligation of the lessor was to allow the removal of the stands and fixtures and to furnish inside space, and the obligation of the lessee was to pay the stipulated rent for the inside space. *The contract did not contemplate the doing of anything violative of law, but it did show upon its face that it provided for the doing of only that which was lawful, because something else, which was mutually more beneficial and desirable, could not be legally done.* In short, the language of the parties evidences a renting of inside space, inasmuch as the ordinance prevented the use of sidewalk space.

110 Tex. at 535, 221 S.W. at 939 (emphasis added). The court reached this conclusion, in part, because a contract fairly open to two interpretations, one of which will make it legal and one of which will make it

illegal, must always be given the construction that makes it legal. *Id.* at 535, 221 S.W. at 939.[12] Finally, and consistently with other authorities cited above, the court described it as

> well settled that where a party has contracted to perform anything, and an illegal act is included therein, that he shall nevertheless be held to perform so much of his contract as it is lawful to perform, if it can be separated from that part which is illegal.

*Id.* at 536, 221 S.W. at 939 (quoting *Hynds v. Hays*, 25 Ind. 36 (1865)). *Accord, Queen Ins. Co. v. Chicago R.I. & P. Ry. Co.*, 201 Ia. 1072, 1076, 206 N.W. 804, 805–06 (1926) (upholding clause in lease which provided that landlord was entitled to proceeds of tenant's insurance if clause disclaiming liability for certain negligent acts were held invalid; court described the provision as to insurance benefits as "a sort of savings clause expressed in the alternative" which was not affected by the invalidity of the exculpatory clause); *Suesskind v. Wilson*, 124 Ohio St. 54, 56, 176 N.E. 889, 890 (1931) (defendant could not evade obligation to comply with lawful promise "upon the ground that there was an alternative promise which in itself would be illegal and unenforceable"); *Hanauer & Co. v. Gray*, 25 Ark. 350, 352 (1869) (enforcing promissory note payable in Confederate bonds or Tennessee money).

The present case is indistinguishable in principle from *Wicks* and from the other decisions cited above. If the oral contract was as Mr. Monroe described it, there was no intent on the part of EDM or GEM to violate the law. The parties agreed to the transfer of the 49% interest to GEM only if such a transfer was lawful; since it was not, then as in *Wicks*, EDM's obligation pursuant to the second alternative immediately became operative, and provided a perfectly legitimate means of compensation.

Our discussion in Part II, *supra,* of the question whether the one percent rule applied to the kind of transfer allegedly agreed to here, reveals that the point had

never been directly addressed by the Commission or, so far as we are aware, by any court. Although we have ruled against EDM's contentions in regard to the applicability to those facts of the one percent rule, its position cannot fairly be described as frivolous or insubstantial. To be sure, Professor Corbin has written that "[if] the illegal performance that is promised is heinous in character, criminal or immoral in high degree, it seems certain that the courts will not enforce a promise that accompanies it, however lawful the latter may be...." 6A CORBIN, *supra,* § 1522, at 762. Because the transfer of a 49% interest to EDM in violation of the one percent rule was never intended to occur unless it was found to be legal, however, the conclusion of the alleged oral agreement cannot plausibly be characterized as falling within an exception for behavior which is heinous or morally degrading.

The decisions relied on by the GEM defendants are distinguishable, at least, upon the common ground that none presented a situation in which the promise to do that which was later found to be unlawful was only to become operative, by the terms of the parties' alleged agreement, if performance was determined to be lawful. *See, e.g., Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 79–83, 102 S.Ct. 851, 857–59, 70 L.Ed.2d 833 (1982); *Continental Wall Paper Co. v. Louis Voigt & Sons Co.*, 212 U.S. 227, 261–62, 29 S.Ct. 280, 291–92, 53 L.Ed. 486 (1909); *McMullen v. Hoffman*, 174 U.S. 639, 653–70, 19 S.Ct. 839, 844–51, 43 L.Ed. 1117 (1899); *Manning v. Metal Stamping Corp*, 396 F.Supp. 1376, 1378 (N.D.Ill.1975), *aff'd without opinion*, 530 F.2d 980 (7th Cir.1976). In all of these cases, the impropriety of the promise which the plaintiff sought to enforce was far more flagrant than anything alleged here.

"There is a zone within which even a well-meaning citizen can not determine whether a proposed bargain is or is not 'illegal.'" 6A CORBIN, *supra,* § 1374, at 4. An incorrect guess as to what the Commission would decide at some later time on a

---

**12.** This principle is likewise recognized in the District of Columbia. *See Leiken v. Wilson*, 445 A.2d 993, 998 (D.C.1982), and authorities there cited.

question which was then open (and which has remained open until today) should not result in forfeiture of all of EDM's rights, especially when a second legitimate alternative was allegedly provided in case the preferred form of compensation was found invalid. If the parties agreed to the bargain as Mr. Monroe described it, the arrangement was one which well-meaning citizens might accept; "we'll compensate you with a 49% share if the FCC allows us to do so, but we'll pay for your services if the Commission says Nyet." Such an agreement may not be ideal from a business perspective, especially if it is not reduced to writing, but it does not suffer from any defect so grave that EDM should be precluded from claiming monetary compensation for lawful services which it has allegedly rendered pursuant to the terms said to have been agreed upon.[13]

### IV

For the foregoing reasons, the order granting summary judgment dismissing the complaint as to defendant Metro Mobile CTS is hereby affirmed. The order granting summary judgment dismissing the complaint as to defendants GEM Cellular and Murray is hereby affirmed in part and reversed in part,[14] and the case is remanded to the trial court for further proceedings consistent with this opinion.

*So ordered.*

---

13. We emphasize that this is an appeal from an order granting summary judgment, and that we hold only that the second alternative of the agreement *as described by Mr. Monroe* does not fail for illegality. We have no occasion, in the present posture of the case, to consider the sufficiency of any hypothetical contract in which EDM's attempt to secure a 49% interest played a more dominant and unconditional role than in Mr. Monroe's version of the terms of the oral agreement.

14. Substantially for the reasons stated by the trial judge, we affirm the order granting summary judgment to the GEM defendants as to all of EDM's claims except breach of contract. *See* Super.Ct.Civ.R. 12–I(k); *Beckman v. Farmer,* 579 A.2d 618, 629 (D.C.1990). EDM's failure to identify issues of fact, as provided in Rule 12–I(k), had the effect of admitting the facts represented by the defendants to be undisputed, at least where, as here, EDM's statements in its verified complaint and in Mr. Monroe's affidavit were more in the nature of legal conclusions than of evidentiary facts, and there was thus no *clear* support in the record for EDM's contrary contentions. *Beckman, supra,* 579 A.2d at 629; *see also* the trial court's order of May 27, 1989 at 7 n. 3. If we were to hold that a party may at its option, as EDM contends, decide not to file a Rule 12–I(k) statement or otherwise enumerate with reasonable precision the material facts alleged to be in dispute, and if we were then to require the judge to search a record of several thousand pages for possible triable issues of material fact, this would surely undermine the purposes of Rules 12–I(k) and 56(e).

In any event, it is readily apparent from EDM's pleadings that its various claims against the GEM defendants, other than breach of contract, are little more than attempts to make the breach of contract claim sound more sinister. On this record, at least the claim of breach of fiduciary duty is altogether frivolous. Again with the exception of the breach of contract claim, EDM's remaining allegations fare only marginally better.