JUBILEE HOUSING, INC.,
et al., Appellants,

v.

DISTRICT OF COLUMBIA WATER
AND SEWER AUTHORITY, et
al., Appellees.

No. 98–CV–629.

District of Columbia Court of Appeals.

Argued Oct. 7, 1999.
Decided June 7, 2001.

Alexander E. Dreier, with whom Jona-
than L. Abram and Jonathan S. Franklin

were on the brief, Washington, for appellants.

Edward E. Schwab, Assistant Corporation Counsel, with whom Jo Anne Robinson, Principal Deputy Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation counsel, and Lutz Alexander Prager, Assistant Deputy Corporation Counsel at the time the brief was filed, were on the brief, for appellees.

Before SCHWELB, RUIZ and REID, Associates Judges.

PER CURIAM:

■ This appeal for review challenges the District of Columbia Water and Sewer Authority's (WASA's) adoption of interim water and sewer rates in December 1996, shortly after it was formed to take over the duties of the Water and Sewer Utility Administration (WASUA). The events leading up to creation of the new entity and the course of agency proceedings that resulted in adoption of the interim rates are set out in Part I ("Factual Summary") of the dissent, which we incorporate by reference. We agree as well with the analysis, discussed in Part II of the dissent, that the Council of the District of Columbia by legislative enactment terminated the preferential water rates previously established for charitable organizations and churches, see former D.C.Code § 43–1545 (1990), and the preferential water and sewer rates for certain nonprofit housing organizations (such as appellant, Jubilee Housing, Inc.), see former D.C.Code § 43–1522.(b), 43–1522.5 and 43–1605(a) (1990), and gave to WASA the authority to "collect and abate fees," D.C.Code § 43–1686(a) (1998 Repl.), and,

"following notice and public hearing" to "establish and adjust retail water and sewer rates," D.C.Code § 43–1686(b) (1998 Repl.).[1] As discussed in Part III of the dissent, we conclude that the manner in which WASA adopted the interim rates complied with the emergency rule making procedures of the District of Columbia Administrative Procedures Act, D.C.Code § 1–1506(c) (1999 Repl.). We conclude, however, that those procedures were not in conformity with the express statutory provisions in the WASA Act that require "notice and public hearing" before establishing rates. D.C.Code § 43–1686(b). We therefore hold that the 1996 interim water and sewer rates were invalid and remand the case to the Superior Court for further proceedings consistent with this opinion.

*Did WASA establish and adopt rates in 1996?*

■ It is undisputed that although WASA provided some notice on December 13, 1996 to the prior beneficiaries of preferential water and sewer rates of its intention to eliminate those preferential rates, it did not hold a public hearing prior to adopting the interim rates on December 19, 1996, to become effective December 27, 1996. Therefore, the remaining question is whether WASA's adoption of the interim rates on December 19, 1996 constituted the "establishment of rates" for purposes of D.C.Code § 43–1686(b). We consider that the only answer is affirmative. Because the Council abolished the preferential rates to nonprofit housing organizations by legislation (indeed abolished all rates), effective 90 days after the initial meeting of the Board of WASA, see D.C. Law 11–

---

1. The repealing provisions of the "Water and Sewer Authority Establishment and Department of Public Works Reorganization Act of 1996", D.C. Law 11–111 §§ 301–306, are not codified.

111, §§ 306, 601, there would be no rates in existence—for any consumers—as of December 27, 1996 unless WASA took action. That WASA did when, after it decided not to continue the policy of preferential rates for certain consumers on December 5, 1996, and thus established that appellants' future rates would not be preferential but on the same basis as those of other consumers, it adopted interim rates for all consumers on December 19, 1996. Particularly with respect to consumers such as appellants, which previously paid no or reduced fees for water and sewer services, the interim rates imposed a new obligation. That the rates were temporary in nature and were at the same level as those previously charged to paying consumers does not, in our view, exempt them from the statutory requirement that they be preceded by notice and public hearing. Unlike the Administrative Procedures Act, which expressly provides for emergency rule making, see D.C.Code § 1–1506(c) (permitting emergency rule making, without the usually required prior notice and publication, if "necessary for the immediate preservation of the public peace, health, safety, welfare, or morals"), nothing in the legislation creating WASA and giving it the authority to "establish" rates "following notice and public hearing" similarly excuses these requirements in exigent situations.[2] Although we sympathize with the practical difficulties faced by a new entity busy with the task of organizing itself and adjusting to a new statutory framework, we cannot, in the face of express and unqualified statutory language,

relax what the legislature has mandated. Any relief must come from that body.

Reversed and remanded.

SCHWELB, Associate Judge, concurring:

I concur in the judgment and opinion of the court, but write separately to elaborate why, in my view, the decision of the trial court cannot be sustained.

WASA's governing statute provides that WASA may "establish" or "adjust" water and sewer rates following notice and a public hearing. See D.C.Code § 43–1686(b) (1998). In my opinion, it was WASA, and not the Council of the District of Columbia, that "established" the current rates for non-profit organizations, including Jubilee Housing, and it did so, in violation of the statute, without the required notice or hearing.

In this case, as the trial judge found, WASA's Board of Directors met on December 5, 1996, and

> decided that financial and policy considerations to accomplish the goal of delivering quality and efficient water and sewer services precluded the Board from offering discounted water and sewer services to the plaintiff organizations.

(Emphasis added.) It is undisputed that this decision was made without prior notice to Jubilee Housing, and without a public hearing. Nevertheless, WASA claims that its action did not "establish" or "adjust" rates for non-profit organizations, and therefore did not violate the requirements of § 43–1686(b). In my view, WASA's position cannot be reconciled with the literal

---

**2.** The requirement for a "public hearing" in the WASA Act is different from the APA's requirement of notice and publication for comment. We also note that a public hearing need not have delayed WASA's decision to adopt interim rates in the same way as a notice and comment period under the APA. We are not free to substitute the APA scheme or import APA exceptions into the WASA Act.

and common-sense meaning of the phrase "establish ... rates."

Our dissenting colleague describes WASA's action as a decision "not to reinstate the legislatively repealed exemptions" for charitable organizations. Dissenting opinion, *post,* at 286. Indeed, her defense of WASA's position is predicated upon the foregoing characterization of what the legislature did. But in 1996, the Council did not, in any meaningful sense, repeal the favored treatment which had been provided for charitable organizations. Rather, the Council prospectively abolished its own authority over water and sewer rates, and it then went on to repeal *all* existing water and sewer rates, both for "regular" customers and for "non-profit" entities such as Jubilee Housing; this repeal was to become effective ninety days after the first meeting of WASA's Board of Directors.[1] *See* Act, §§ 301–06, 601.[2]

The Council further directed that "[t]he Authority shall ... establish and adjust retail water and sewer rates." D.C.Code § 43–1686(b). In connection with this directive, the Council provided, as I have previously noted, that rates were to be established and adjusted "following notice and public hearing." *Id.* Finally, the Council expressly transferred to WASA the power "[t]o determine whether ... charitable organizations" should be "furnished with water and sewer service without charge." D.C.Code § 43–1673(31). The legislature thus left to WASA the determination whether non-profit organizations, such as Jubilee Housing, should continue to receive more favorable treatment than other customers do with regard to water and sewer rates.

As contemplated by the Act, WASA undertook to establish rates for users, both for regular customers and for charitable organizations, before the existing rates expired on December 26, 1996. The minutes of WASA's Board of Directors during the autumn of 1996 reveal that the "elimination of exemptions or reductions in water/sewer bills for non-profit organizations and churches" was one of the "action items" at the Board's initial meeting on September 26, 1996. The issue was further addressed at subsequent Board meetings, and the Board's "Retail Rates Committee" was charged with the task of developing a position paper and a recommendation. Finally, on December 5, 1996, in conformity with a recommendation of the "Retail Rate Committee," the Board of Directors decided that effective December 26, 1996, non-profit organizations "will be billed the full rate for water and sewer services."

On December 13, 1996, WASA's General Manager, Larry King, sent a letter to Jubilee Housing in which he explained WASA's authority to make this decision and its reasons for having done so. Mr. King wrote that WASA's Board of Directors had "considered the matter of continuing allowances for water and sewer services for Non Profit Housing Developments at [its] meeting on Thursday, December 5, 1996," that the Act "gave the Board of Directors the responsibility for determining whether free and discounted water allowances should continue," and that

---

1. The Board's first meeting took place on September 26, 1996. WASA was therefore obliged to establish rates for all users, including non-profit organizations, by December 26, 1996.

2. References in this opinion to the "Act" are to the "Water and Sewer Authority Establishment and Department of Public Works Reorganization Act of 1996." D.C. Law 11–111, 43 D.C.Reg. 548 (Apr. 18, 1996), codified at D.C.Code §§ 43–1501 *et seq.*

after balancing the important financial and policy considerations surrounding the delivery of quality and efficient water and sewer services, the Board of Directors had no other alternative except to discontinue the free water allowance currently provided to you effective December 26, 1996.

In other words, as WASA's General Manager explained in his letter, the Authority had weighed the pros and cons of continuing to provide more favorable treatment for non-profit organizations, had decided against retaining such favored treatment, and had set, or established, Jubilee Housing's rates at the same level as "regular" customers would be required to pay. On December 19, 1996, WASA adopted interim rates for all consumers, and, in conformity with its decision of December 5, provided no exemption or preferential treatment for Jubilee Housing.

"Courts deal with the substance rather than the form of transactions." *E.D.M. & Assocs. v. GEM Cellular, et al.*, 597 A.2d 384, 387–88 (D.C.1998) (citations omitted). The focus is, or should be, on the "practical consequences of the existing situation," so that "important legislative policies" will not be thwarted on the basis of considerations not pertinent to the substance of the issue. *Id.* In this case, the substance of the roles played by the Council and WASA in establishing the rates applicable to Jubilee Housing is not difficult to fathom. The Council effectively washed its hands of the setting of water and sewer rates and conferred on WASA the responsibility for doing so. The Council specifically directed WASA to determine the appropriate rates for non-profit organizations. By transferring its authority on this issue to WASA without providing any guidance as to which way the Authority should go, the Council effectively adopted a posture of neutrality regarding whether non-profit organizations should or should not be subject to the same rates as other customers.

As a result of this legislative action, it was WASA, and not the Council, which subsequently decided that non-profit organizations would not be accorded the favorable treatment that had been provided to them in the past. It was therefore the Authority, and not the Council, that "established" the rates complained of within the meaning of § 43–1686(b). To hold otherwise would be to assert that the rates were "established" by an entity (the Council) which took no position on what the rates should be, rather than by the body (WASA) which weighed the competing policy considerations and made the difficult and controversial call that generated this litigation.

WASA's disputed action of December 5, 1996, which in my view established the rates to be charged to non-profit organizations, was taken without notice to Jubilee Housing and without the public hearing required by the Act. WASA's action defeated the "important legislative polic[y]," *E.D.M. & Assocs., supra,* 597 A.2d at 388, requiring notice and a public hearing before rates may be established or adjusted. Accordingly, I agree with the court that the rates were not lawfully adopted, and that the decision of the trial court sustaining the Authority's action should be reversed.

REID, Associate Judge, dissenting:

I respectfully disagree with the majority's conclusion that procedures followed by the Authority to establish interim rates for charitable organizations, churches, and certain non-profit housing entities "were not in conformity with the express statutory provisions of the WASA Act that require 'notice and public hearing' before establishing rates." Part I of this opinion sets forth a factual summary and back-

ground information. Part II examines the plain meaning of the pertinent statutory provision and concludes that the Council legislatively ended the free or reduced water and sewer rates for charitable organizations, churches, and non-profit housing entities. Part III discusses the process the Authority followed in deciding not to reinstate the legislatively repealed exemptions. Part IV focuses on whether the Authority "established" or "adjusted" rates in December 1996, determines that it did not, within the meaning of the pertinent statutory provision, and concludes that the Authority's emergency rulemaking was consistent with the WASA Act.

## I.

In Fall 1995, the Council of the District of Columbia ("the Council") considered legislation creating an independent corporate body, the District of Columbia Water and Sewer Authority ("the Authority"), comprised of representatives from the District of Columbia, Maryland and Virginia. At the time of the Council's consideration of the legislation, the Water and Sewer Utility Administration of the District of Columbia Department of Public Works ("DPW WASUA") was responsible for the delivery of water and sewer services in the District of Columbia and part of the Metropolitan Washington area, including sections of Maryland and Virginia. Due to maintenance requirements, financial concerns, federal mandates, and customer demands within the District and the affected Metropolitan area jurisdictions, the Council's Committee on Public Works and the Environment recommended creation of the multi-jurisdictional Authority. *See* Council of the District of Columbia, Committee on Public Works and the Environment, "Report on an Amendment in the Nature of a Substitute to Bill 11–102, the 'Water and Sewer Authority Establishment and De-partment of Public Works Reorganization Act of 1995,'" October 25, 1995, at 3. The mission of the Authority is "to oversee water and sewer operations for the District and surrounding jurisdictions...." D.C.Code § 43–1661(4) (1998). The Council envisioned that creation of the Authority would "enhance the financial viability of water distribution and sewage collection, treatment, and disposal systems in the District and enhance the District's ability to meet its statutory obligation to provide sanitary sewer services to the surrounding jurisdictions." *Id.* Establishment of this independent entity required the repeal and modification of certain existing District statutory provisions and the enactment of new legislation. Generally, the initial legislation governing the Authority took effect on April 18, 1996, although specific provisions, including those related to free and discounted water and sewer services for charitable organizations, churches and certain non-profit housing entities did not become effective until ninety days after the first meeting of the Board of Directors of the Authority, or December 27, 1996. The delayed effective date for certain provisions was necessitated by the fact that after the legislation was enacted, the rather complicated transition from administration of the water and sewer system by DPW WASUA to management by the multi-jurisdictional Authority had to be put into place.

With respect to the discontinuance of free and discounted services for charitable organizations, churches and certain non-profit housing entities, which is the subject of the case before us, background information should assist in our analysis of the specific issues raised by the appellants. Prior to the enactment of the new legislation, certain charitable organizations and churches were exempted by legislation

from paying water charges.[1] In addition, the sewer charges for these entities were "predicated only on the quantity of water used in excess of the amount fixed by the Mayor...."[2] Moreover, under earlier amendments to the old legislation, certain non-profit housing developments paid reduced water and sewer rates, as of 1982.[3] With regard to rate making, or the establishment and fixing of water and sewer rates under the old system, water rates generally were recommended by the Mayor and the specific charge for metered and unmetered service was detailed in statutory provisions. Sewer service rates generally were established by the Council.[4]

As originally enacted, the Act repealed sections of the D.C.Code that authorized exemptions for water charges or reduced rates for charitable organizations, churches and certain non-profit housing entities, see notes 1 and 3, *infra.* The Act also repealed the rate setting provisions of D.C.Code § 43–1524 (water rates) and § 43–1604 (sewer rates), as well as the specific rates set forth in the statutory provisions, see note 4, *infra.* Instead of the old statutory exemptions, § 203 of the Act, D.C.Code § 43–1673(31), authorized the Authority "[t]o determine whether churches, charitable organizations, or institutions that receive annual appropriations from Congress should be furnished with water or sewer service without charge." In addition, § 216(a) and (b) of the Act, D.C.Code § 43–1686(b), specified:

(a) The Authority shall collect and abate charges, fees, assessments, and levies for services, facilities or commodities furnished or supplied by it.

(b) The Authority shall, following notice and public hearing, establish and adjust retail water and sewer rates. The District members of the Board [of Directors of the Authority] shall establish the retail water and sewer rates prior to the Board's consideration of the Authority's budget. The water and sewer rates levied by the Authority shall only be a source of revenue for the maintenance of the District's supply of water and sewage systems, and shall constitute a fund exclusively to defray any cost of the Authority.

Thus, the Council not only gave the Authority the power to decide whether any

---

1. Beginning in 1905, former D.C.Code § 43–1545, which was repealed by the new legislation, authorized the Mayor of the District to provide water without charge to charitable institutions, including churches. Educational institutions, except for "charity schools," were excluded from the definition of charitable institutions. The repeal became effective ninety days after the first meeting of the Authority's governing board, which was held on September 26, 1996.

2. D.C.Code § 43–1611. This section was not repealed by the new legislation.

3. *See* D.C.Code §§ 43–1522(a)(3), 43–1522.5 and 43–1605(d) (1990). Provisions relating to reduced water and sewer rates for certain non-profit housing developments were repealed by the new legislation.

4. *See* D.C.Code § 43–1522 (1990) and § 43–1605. Section 43–1524 (repealed) provided in pertinent part:

The Council of the District of Columbia is authorized from time to time to fix the rates charged by the District for water and water services furnished by the District water supply system, at such amount as the Council, on the basis of a recommendation made by the Mayor of the District of Columbia, determines is necessary to meet the expense to the District of furnishing such water and water services.

Under § 43–1604 (repealed), "[t]he Council of the District of Columbia [was] authorized to establish charges for the provision of sanitary sewer service...." However, the sewer charges for churches and charitable institutions were determined by the Mayor, *see* § 43–1611; this section was not repealed by the new legislation.

exemptions should continue, but also to collect charges for services, and to determine the basis for setting rates.

At its September 26, 1996 meeting, the Board of Directors ("the Board") noted, as one of its future action items, "elimination of exemptions or reductions in water/sewer bills for non-profit organizations and churches." The Board minutes of October 3, 1996, reflect the following comments regarding the exemptions or reductions:

[The Chairman of the Board] addressed the exemptions granted to churches and non-profit organizations. He stressed that the Board needs to know if the exemptions are standard practices in other municipalities.

[The Director of .DPW] assured the Board that he would provide the rate increase data from other municipalities.

[The Chairman of the Board] referred the rate increase issue to the Retail Rate Committee.

According to a short notation in the minutes of November 7, 1996, the Board's Retail Rates Committee "discussed ... free and discounted water, and proposed rate increases; ... [t]he Committee recognized the impact of free and discounted water ... on bond ratings, budget and rate requirements, and stated that recommendations would be made to the Board at the November 21[m]eeting." [5]

As indicated, the Act specified that the effective date for the repeal of provisions relating to free water charges and rate setting would be "90 days after the initial meeting of the Board [of Directors] established by section 204" of the Act, D.C.Code § 43–1674. In addition, the old water and sewer rates were scheduled to expire at the same time, that is, on December 26, 1996. At its December 5, 1996 meeting, the Chairman of the Board advised that the Retail Rates Committee had recommended terminating the free and discounted water and sewer services for charitable institutions, and requiring these institutions to pay the full rate for such services beginning on December 26, 1996. [6] The Board approved the recommendation, and it was implemented on December 13, 1996, by letter to all charitable institutions. The letter received by Jubilee Housing from the Authority stated:

The Board of Directors of the District of Columbia Water and Sewer Authority (WASA) considered the matter of continuing allowances for water and sewer services to Non–Profit Housing Developments at their meeting on Thursday, December 5, 1996. After balancing the important financial and policy considerations surrounding the delivery of quality and efficient water and sewer services, the Board of Directors had no other alternative except to discontinue the free water allowance currently provided to you effective December 26, 1996.

The Water and Sewer Authority Establishment and Department of Public Works Reorganization Act of 1996, D.C. Law 11–111, Section 203(31) and Section 216 gave the Board of Directors the responsibility for determining whether free and discounted water allowances should continue. The requirements to improve the water and wastewater sys-

5. There are no minutes for a November 21, 1996 Board meeting in the record on appeal.

6. The Board minutes for December 5, 1996 contain the following statement:

[The Board Chairman] reported that the Retail Rates Committee recommends that the Interim General Manager notify all charitable institutions by December 13, 1996 who receive free and discounted water and sewer services that effective December 26, 1996, they will be billed the full rate for water and sewer services.

tems, will not allow this practice to continue.

Our records indicate that Jubilee Housing Inc. is currently provided water and sewer allowances. According to Section 601 of D.C. Law 11–111, the entitlement to this allowance ends 90 days after the Board of Directors of the D.C. Water and Sewer Authority held its first meeting, which was September 26, 1996. Therefore, you will be charged for water and sewer service at current rates starting on December 27, 1996.

A hotline has been established to answer questions regarding this policy and your account. You may call 727–2044 between the hours of 8:15 a.m. and 4:30 p.m.

We value your business and hope to make this transition as smooth as possible.

The Authority apparently sent a similar letter to other charitable organizations, churches, and affected non-profit housing entities.

The Board took additional implementing action at a meeting held on December 19, 1996, when it approved the issuance of emergency rulemaking continuing existing water and sewer rates. As of December 27, 1996, the Authority charged the existing rates to all customers, including the charitable organizations, churches, and affected non-profit housing entities. Notice of the emergency rulemaking was published in the District of Columbia Register on January 10, 1997. *See* 44 DCR 236 (1997).

Proposed new rates for water and sewer services, effective April 1, 1997, which are not at issue in this case, were approved by the Board at its January 30, 1996 meeting, and called for a 42% increase in water rates. *See* 44 DCR 219 (1997). A public hearing on the proposed rules occurred on January 30, 1997, after which final rules were adopted, and became effective on April 4, 1997. *See* 44 DCR 1993 (1997).

After writing unsuccessful letters protesting the elimination of their exemptions and the increase in water rates,[7] Jubilee Housing, the Downtown Cluster of Congregations ("the Downtown Cluster"), and WCA filed a lawsuit in the Superior Court of the District of Columbia on June 11, 1997, alleging that the Authority violated D.C.Code § 43–1686(b) (rate setting provision), as well provisions of the APA, specifically, D.C.Code § 1–1506 (publication of notice of proposed action) and § 1–1504(a) (open meeting requirement for actions taken by an agency).

Subsequent to the filing of their lawsuit, on July 3, 1997, Jubilee Housing and the other appellants filed a motion for summary judgment. In an order dated March 27, 1998, the trial court denied the motion,

---

7. On February 12, 1997, counsel for appellants sent a letter to the Board requesting that the fees imposed on the charitable organizations, churches and affected non-profit housing entities be suspended and that a public hearing be held on the water and sewer rates. An earlier December 20, 1996 letter of protest had been sent to the Authority by Jubilee. On February 13, 1997, the Board chairperson responded to Jubilee's letter, explaining that the Board's decision to discontinue the exemptions and reduced rates would not be changed, and stating, in part, its "willing[ness] to negotiate liberal partial payment agreements on an individual basis, with any organization adversely affected by the new policy." In an April 28, 1997 response letter, counsel for Jubilee proposed a payment plan covering the years 1997 through 2000. However, the Authority advised counsel for Jubilee that it had received legal advice indicating that, "the Authority's polic[ies] do not permit consideration of predelinquency discounts and/or, payment plans"; and that: "The current policy/procedures only allow payment plans on accounts that have already been billed."

concluding, in part, that the exemptions for charitable organizations, churches, and certain non-profit housing entities, had been eliminated through legislative action rather than rulemaking:

> [T]he most compelling reading of the Council's actions is that advocated by the Authority—namely, that the Council, concerned with the deteriorating delivery of water and sewer services in the District of Columbia, did away with the Council/Mayor rate setting structure and rates, and lodged plenary power in the Authority to resolve those issues. With the effective date of the repealer, the plaintiff organizations were placed on the same rate level as other retail establishments. They were to pay the standard rates unless and until the Authority decided that they should receive discounted services. In short, the Council established a level playing field to be adjusted, if warranted, by Authority action. The elimination of plaintiff[s'] preference was a legislative action, not an administrative action.

On April 8, 1998, the District moved for summary judgment, citing the trial court's order denying the motion for summary judgment submitted by Jubilee Housing and the other appellants. The court granted the motion, and appellants filed a timely notice of appeal.

Jubilee Housing, Downtown Cluster, and WCA first contend that:

> There is no provision in the Act—and the trial court cited none—that remotely supports the court's conclusions that the Act itself provided that plaintiffs "were to pay the same rates unless and until the Authority decided they should receive discounted services," and that the elimination of free and discounted service "was a legislative action, not an administrative action."

Second, appellants argue that the Board's December emergency rulemaking was not valid with respect to the establishment or adjustment of their rates, and that even if the emergency rulemaking validly established or adjusted their rates, it was invalid with respect to any "rate increase." These arguments require us to construe the relevant statutory provisions. Therefore, we review this matter *de novo*. See *District of Columbia v. Gallagher*, 734 A.2d 1087, 1090 (D.C.1999).

## II.

We begin with the applicable legal principles. We look first to the plain meaning of the statute. As we said in *J. Parreco & Son v. Rental Hous. Comm'n*, 567 A.2d 43 (D.C.1989): "In interpreting a statute, we are mindful of the maxim that we must look first to its language; if the words are clear and unambiguous, we must give effect to its plain meaning." *Id.* at 45 (citing *Office of People's Counsel v. Public Serv. Comm'n*, 477 A.2d 1079, 1083 (D.C.1984)) (other citations omitted). In applying the plain meaning concept, " 'the words of the statute should be construed according to their ordinary sense and with the meaning commonly attributed to them.' " *Gallagher, supra,* 734 A.2d at 1090 (quoting *Davis v. United States*, 397 A.2d 951, 956 (D.C.1979)) (other citations omitted). "The literal words of [a] statute, however, are 'not the sole index to legislative intent,' " *Lange v. United States*, 143 U.S.App. D.C. 305, 307, 443 F.2d 720, 722 (1971), but rather, are 'to be read in the light of the statute taken as a whole, and are to be given a sensible construction and one that would not work an obvious injustice.' " *Gallagher, supra,* 743 at 1091 (quoting *Metzler v. Edwards*, 53 A.2d 42, 44 (D.C. 1947) (footnotes omitted)) (other citations omitted). Nonetheless, "even when the words of a statute may appear, on superficial examination, to be clear and unambig-

uous, [w]ords are inexact tools at best, and for that reason there is wisely no rule of law forbidding resort to explanatory legislative history...." *Id.* (quoting *Harrison v. Northern Trust Co.*, 317 U.S. 476, 479, 63 S.Ct. 361, 87 L.Ed. 407 (1943)) (internal quotations omitted) (other citations omitted). In that regard, " '[t]he literal wording of the statute is a primary index but not the sole index to legislative intent. It cannot prevail over strong contrary indications in the legislative history or so as to command an absurd result.' " *Citizens Ass'n of Georgetown v. Zoning Comm'n of the District of Columbia*, 392 A.2d 1027, 1033 (D.C.1978) (quoting *Lange, supra*, 143 U.S.App. D.C. at 307–08, 443 F.2d at 722–23) (footnotes omitted).

In examining the plain words of the Act, § 203(31), D.C.Code § 43–1673(31), clearly authorizes the Authority to decide whether charitable institutions, including churches, should receive free water and sewer services, after the legislative exemptions were repealed. This determination is distinct from rate setting which is governed by § 216(b) of the Act, D.C.Code § 43–1686(b). Section 43–1686(b) empowered the Authority to "establish and adjust retail water and sewer rates" after notice and a public hearing. Title III of the Act, which repealed certain provisions relating to free or discounted water and sewer services, as well as sections of the old statute pertaining to the establishment of water and sewer rates, makes it clear, as the trial judge recognized, that power over policies applicable to the water and sewer system servicing the District and surrounding jurisdictions, and over rates to be charged for water and sewer services, shifted to an independent entity, the Authority, and thus, power no longer was lodged in the Council, the Mayor and DPW. The plain words of the statute also show that, unlike rate setting, no particular procedure was required in connection with the Authority's decision to continue or discontinue free or discounted water and sewer services for charitable organizations, churches, and certain non-profit housing entities, after the legislative repeal of their exemptions. Notice and a public hearing were not specified for that decision; however, it was taken during a public meeting.

## III.

We turn now to the process followed by the Authority in deciding whether to continue the free or discounted water and sewer services, and to the impact, if any, of the APA on that process. In the case before us, the Authority's decision not to reinstate the legislatively repealed exemptions from water or sewer rates, was taken at a Board meeting on December 5, 1996, and the charitable organizations, churches, and certain non-profit housing entities, were notified, individually, by letter of December 13, 1996, that they would "be charged for water and sewer service at current rates starting on December 27, 1996." Furthermore, the letter stated that: "A hotline [telephone number with specific hours of service] has been established to answer questions regarding this policy and your account." The record before us shows that, upon receipt of their letters, at least Jubilee Housing and the Downtown Cluster sent return letters to the Authority.[8] Since the statute is silent as to the procedure for deciding the exemptions issue, we turn to the legislative history of the Act.

**8.** The record references a December 20, 1996 letter from Jubilee Housing, and a December 30, 1996 letter from the Downtown Cluster, but copies of these letters were not included in the record.

### A.

In ascertaining whether notification by letter, was consistent with legislative intent, a review of the legislative history of the Act is instructive. The committee report which accompanied the bill that ultimately resulted in the Act stated, in part:

> The Committee notes for the record that the District's Administrative Procedure law will apply to this Authority. This will provide assurances to the public, including District residents and employees of the Authority, that appropriate procedures will be followed by the Authority with regards to meetings, notices, rulemaking, regulations, etc.

*See also* D.C.Code § 43–1672(b) (providing that with the exception of the District's procurement and merit personnel systems, "the Authority shall be subject to all laws applicable to offices, agencies, departments and instrumentalities of the District government, [and the Home Rule Act]"). The APA, D.C.Code § 1–1501 *et seq.* (1999), requires that, prior to adoption, notice of a rule be published in the District of Columbia Register ("DCR") for at least thirty days so that interested persons may have an "opportunity to submit data and views either orally or in writing...." Section 1–1506(a). Two pertinent exceptions to the requirement of prior publication appear in § 1–1506. One exception is set forth in § 1–1506(a), which mandates prior notice through publication in the DCR "unless all persons subject [to the policy] have actual notice thereof in accordance with law...." The other exception appears in § 1–1506(c), which permits the adoption of an emergency rule, with immediate effect, without prior notification and publication, "if, in an emergency, as determined by the Mayor or an independent agency, the adoption of a rule is necessary for the immediate preservation of the public peace, health, safety, welfare, or morals...."

### B.

We next examine the question, whether the Authority was required, prior to its adoption of the policy not to reinstate the legislatively repealed exemptions for charitable organizations, churches, and certain non-profit housing entities, to publish its intention for comment in the DCR before the policy could take effect? Generally, an agency's rules must be published in the DCR. The APA defines a "rule" as: "the whole or any part of any Mayor's or agency's statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or to describe the organization, procedure, or practice requirements of the Mayor or of any agency." D.C.Code § 1–1502(6); *see also Webb v. District of Columbia Dep't of Human Servs,* 618 A.2d 148, 151 (D.C.1992).

We conclude that the Authority's December 5, 1996 decision not to reinstate the legislatively repealed exemptions for charitable institutions, churches, and certain non-profit housing entities, constituted a statement of particular applicability and future effect under the APA, which prescribed and implemented policy. *Id.* (agency policies concerning homemaker services program fit the definition of a rule, defined in the APA); *see also Rorie v. District of Columbia Dep't of Human Res.,* 403 A.2d 1148, 1153 (D.C.1979) (policies concerning emergency assistance are rules subject to APA requirements); *Junghans v. Dep't of Human Res.,* 289 A.2d 17, 23, 25 (D.C.1972) (Commissioner's order reducing monthly public assistance payments was a rule under the APA). Therefore, the Authority's proposal to adopt the policy discontinuing free or discounted rates was required to be published in the DCR for comment, unless those

subject to the proposal were given actual notice, or an emergency existed, which affected public peace, health, safety, welfare, or morals, that justified emergency rulemaking under the APA. *See* D.C.Code § 1–1506(a) and (c).

From the record before us, it appears that the Authority sent separate letters to all affected entities on December 13, 1996, prior to the December 26, 1996 effective date of the Council's repeal of the free or discounted water and sewer service statutory provisions, and one week following the Board's decision, taken during a public meeting, not to reinstate the exemptions for the charitable organizations, churches and affected non-profit entities. Thus, the charitable entities received actual notice of the Authority's policy under the following part of § 1–1506(a):

The Mayor and each independent agency shall, prior to the adoption of any rule or the amendment or repeal thereof, publish in the District of Columbia Register (*unless all persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law* ) notice of the intended action so as to afford interested persons opportunity to submit data and views either orally or in writing, as may be specified in such notice.

(Emphasis added). *See Duke City Lumber Co. v. Butz,* 382 F.Supp. 362, 372 (D.D.C.1974),[9] *aff'd on other grounds,* 176 U.S.App. D.C. 218, 539 F.2d 220 (1976), *cert. denied sub nom, Duke City Lumber Co. v. Knebel,* 429 U.S. 1039, 97 S.Ct. 737,

50 L.Ed.2d 751 (1977). The question remains, however, whether the letters sent to the charitable entities by the Authority and the creation of a hotline for answering questions about the Authority's policy not to reinstate the legislatively repealed exemptions were "in accordance with law," and further, whether a thirty day prior notice period was required by the second sentence of § 1–1506(a) which reads:

The publication or service required by this subsection of any notice shall be made not less than 30 days prior to the effective date of the proposed adoption, amendment, or repeal, as the case may be, except as otherwise provided by the Mayor or the agency upon good cause found and published with the notice.

Jubilee Housing and the other appellants do not assert that the Authority's letter failed to reach them, or that the actual notice was not sent in accordance with the law, or that they did not have an immediate opportunity to raise questions about the discontinuance of the exemptions, prior to the effective date. In fact, Jubilee Housing and Downtown Cluster made their views known to the Authority prior to the effective date of the policy, and thus, they had an opportunity to comment on the policy prior to its taking effect.

Not only did the affected entities receive actual notice of the Authority's policy, but the record reveals a clear basis for the Authority's emergency action. Therefore, for the following reasons, we conclude that the Authority's emergency rulemaking was consistent with the APA.[10] Under

9. The case involved the federal provision on which § 1–1506(a) is based, 5 U.S.C. § 553(b) which provides in pertinent part: " 'general notice of proposed rule[ ]making shall be published in the Federal Register, *unless persons subject thereto* are named and either personally served or *otherwise have actual notice* thereof in accordance with law.' " 382 F.Supp. at 372 n. 26 (Emphasis in original).

10. Contrary to the District's argument, the Authority's December 1996 decision to continue then existing water and sewer rates arguably may be regarded as a statement of general applicability and future effect designed to prescribe an agency policy, within the meaning of § 1–1506(a), and thus, to require rulemaking.

D.C.Code § 1–1506(c), an agency may adopt an emergency rule, without prior notification and publication, "if ... the adoption of a rule is necessary for the immediate preservation of the public peace, health, safety, welfare, or morals...." Without the continuation, after December 26, 1996, of then existing rates for water and sewer services, the Authority would not have been able to collect revenues needed to maintain water and sewer services, and to address the deteriorating water and sewer system. Hence, its rationale for the emergency rule, "the continuation of water and sewer services," fell squarely within the language of § 1–1506(c) since the rule was "necessary for the immediate preservation of the public ... health...." The appellants also argue that if any emergency existed, "it was one of the Authority's own making," since it had ample time after the April 18, 1996 effective date of the Act to provide notice, opportunity for comment and a public hearing. This argument disregards the fact that certain actions had to be taken before the Authority could function, including the establishment of an eleven person governing Board composed of six persons who had to be nominated by the Mayor with the advice and consent of the Council, and five persons who had to be recommended to the Mayor for appointment by other surrounding jurisdictions, including Fairfax County, Virginia, Montgomery County, Maryland, and Prince George's County, Maryland. See D.C.Code § 43–1674(a)(2) and (3). In addition, following the same process for regular Board nominees, the Mayor had to appoint an alternate for each Board member. See

D.C.Code § 43–1674(a)(4). Furthermore, among other transition actions, certain personnel and functions had to be transferred from DPW to the Authority. See § 43–1685, § 43–1689. Thus, the Authority's emergency rulemaking was reasonable under the circumstances, and did not violate the APA.

Furthermore, the legislative history of the Act reveals that DPW WASUA, which administered the water and sewer system servicing the District and certain surrounding Metropolitan areas prior to the creation of the Authority, "consist[ed] of 1,242 employees, 2,400 miles of sewers, 1,300 miles of water mains, 25,000 catch basins, 27 pumping stations, and ha[d] a capacity to treat 309 million gallons per day of wastewater." Legislative History, at 2. The transition from DPW WASUA to the Authority, after the Act became law in April 1996, required the performance of both routine and complicated tasks, including the implementation of the governance system (Board and management), the resolution of issues pertaining to DPW WASUA's workforce, the determination of budgetary requirements and revenue shortfall,[11] the assessment of environmental and plant maintenance needs, the compliance with federal enforcement requirements, and the process for ratemaking. See "Report and Recommendation of the Retail Rates Committee," presented at a special meeting of the Board on March 28, 1997. Consequently, we conclude that, given the financial and budgetary constraints faced by the Authority, and the deteriorating condition of the water and sewer system, and the absence of any complaint about the non-receipt of the Au-

---

11. The Board's Budget Committee determined, "that in order to meet the minimum environmental capital and operating needs, [the Authority] would require a budget of approximately $256,592,000. However, current projected revenue *from District retail rates* will fall short of meeting this budget need by $32,795,000." (Emphasis in original). "Report and Recommendation of the Retail Rates Committee," presented to a special meeting of the Board on March 28, 1997.

thority's letter, the announcement of the Authority's policy to discontinue free or discounted water and sewer services, through actual notice by letter to affected entities prior to the effective date of the policy, and the December 19, 1996, emergency rulemaking decision, taken during a public meeting of the Authority, satisfied the requirements of the APA with respect to the issue of the non-reinstatement of the legislatively repealed exemptions.

## IV.

I next examine the appellants' contention that their water and sewer rates were established or adjusted, effective December 26, 1996, without notice and an opportunity for comment, or a public hearing, as required by D.C.Code § 43–1686(b). My colleagues and I part company at this point because, unlike them, I agree with the District that the Authority did not "establish" or "adjust" rates in December 1996. A plain reading of the Act leads me to the conclusion that once the Authority decided not to reinstate the exemptions for the charitable organizations, churches, and affected non-profit housing entities, they were to be treated, automatically, in the same manner as other consumers of water and sewer services. I see nothing in the Act that prevented the Authority from taking action under D.C.Code § 43–1686(a) which provides that: "The Authority shall collect and abate charges, fees, assessments, and levies for services, facilities, or commodities furnished or supplied by it." Thus, in keeping with its statutory mandate to collect charges, the Authority advised the charitable organizations, churches and non-profit entities, in its December 13, 1996 letter, that: "[Y]ou will be charged for water and sewer service at current rates starting on December 27, 1996." Then, at its December 19, 1996 meeting, the Board duly adopted an emergency resolution, applicable to all consum-

ers of water and sewer services, "to continue the current water and sewer rates until new rates become effective." Furthermore, the Board approved an emergency rule at the same meeting specifying, in essence, that water and sewer rates set forth in certain repealed sections of the old legislation, would remain in effect. A notice of emergency rulemaking to this effect was published in the DCR, 44 DCR 236 (January 10, 1997). It stated, in part that: "The present action does no more than continue rates that have previously been established as fair and reasonable. The continuation of water and sewer services justifies emergency action." There was no need to single out the charitable organizations, churches and certain non-profit housing entities, because, with the legislative repeal of their exemptions, they were treated as other consumers whose charges for water and sewer services were collected pursuant to § 43–1686(a). They paid the same rates as other customers. In that respect, their rates were not increased.

Thus, in my view, the emergency rule did not "establish" or "adjust" or increase water and sewer rates for charitable organizations, churches, and certain non-profit housing entities, within the meaning of § 43–1686(b). Rather, it simply made clear that existing water and sewer rates would apply to these institutions because the Council had repealed their exemptions, and the Authority had decided not to reinstate them, but instead, to exercise its Authority, under § 43–1686(a), to collect the existing rates from all customers. In that regard, the continuation of existing rates is not the same as rate setting within the meaning of § 43–1686. Therefore, I see no need to remand this matter to the Authority for further proceedings.

Accordingly, for the foregoing reasons, I would affirm the judgment of the trial

court granting summary judgment in favor of appellees.