**DISTRICT OF COLUMBIA PRESER-VATION LEAGUE, Petitioner**

v.

**DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS, Respondent.**

Scoville Street Corporation, Intervenor.

No. 93–AA–198.

District of Columbia Court of Appeals.

Argued March 30, 1994.

Decided Aug. 22, 1994.

As Amended Sept. 26, 1994.

Richard B. Nettler, with whom Sharon Buccino, Washington, DC, was on the brief, for petitioner.

Lutz Alexander Prager, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, DC, were on the brief, for respondent.

J. Kirkwood White, Washington, DC, for intervenor.

Before FERREN and TERRY, Associate Judges, and PRYOR, Senior Judge.

TERRY, Associate Judge:

Petitioner, the District of Columbia Preservation League ("DCPL"), seeks review of an order issued by the Mayor's agent, after an evidentiary hearing, which granted the application of Scoville Street Corporation

("Scoville") to demolish a historic landmark building which it owns in the District of Columbia.[1] The DCPL argues that the Historic Landmark and Historic District Preservation Act of 1978 ("Preservation Act"), D.C. Law No. 2–144, codified at D.C.Code §§ 5–1001 through 5–1015 (1988), does not authorize the demolition of a historic landmark when (1) the owner is not suffering economic hardship, (2) the demolition will not ultimately enhance the landmark, and (3) demolition is not necessary to allow the construction of a project of special merit. The DCPL also contends that the building's structural instability and possible threat to the health and welfare of the community are factors that the Mayor's agent is not permitted to consider under the Preservation Act. In opposition, Scoville and the Department of Consumer and Regulatory Affairs ("DCRA")[2] assert that the Mayor's agent acted consistently with the Preservation Act in granting the permit. Moreover, the DCRA requests a remand of this case so that the Mayor's agent may impose a restrictive covenant, to run with the land, in order to ensure that any future development of the site at issue will be in conformity with the present structure.

We hold that the Mayor's agent did in fact exceed his statutory authority under the Preservation Act in granting the demolition permit, and thus we reverse his decision. We also hold that the Mayor's agent has no authority to impose a restrictive covenant on the land, and thus we reject the DCRA's suggestion to remand the case for that purpose. Instead, we direct the Mayor's agent on remand to refer this case to either the Condemnation Board or the Corporation Counsel for further proceedings consistent with this opinion.

## I

### A. *Facts and Procedural History*

On January 15, 1990, Scoville purchased the President Monroe apartment building ("the Monroe") on Massachusetts Avenue, N.W., as part of its ongoing plan to acquire and resell to developers adjacent parcels of land situated in the Downtown Development District.[3] Scoville tried to gain permission to demolish the Monroe after several reported incidents of criminal activity in the vacant building. At that time, however, the Historic Preservation Review Board ("Preservation Board") was considering whether to designate the Monroe, which was built in 1902, as a historic landmark. Such a designation, if granted, would forestall Scoville's efforts to tear it down. The Monroe ultimately was designated as a historic landmark on January 16, 1991.[4]

In February 1992 Scoville officially applied for a permit to demolish the Monroe. Exercising its authority under D.C.Code §§ 5–1003(c)(1) and 5–1004(b), the Preservation Board reviewed Scoville's application and recommended that the application be denied, concluding that the "proposed demolition is inconsistent with the purposes of D.C. Law 2–144 [the Preservation Act].…" Scoville then requested a public hearing before the Mayor's agent. Scoville also notified the Preservation Board that it intended to claim at the hearing that denial of the demolition permit would result in "unreasonable eco-

---

1. D.C.Code § 5–1004(c) (1988) requires the Mayor, in cases such as this, to hold a public hearing before issuing a permit to demolish a historic landmark. Under D.C.Code § 5–1002(8), the Mayor may act through a "designated agent." In this case the Mayor's agent was an administrative law judge.

2. The DCRA, not the Mayor's agent, is the actual respondent in this case. The Mayor's agent simply directed the DCRA to issue the demolition permit. It did so, but its order has been stayed pending appellate review.

3. According to Jerry Sills, the president of Scoville, his company had been buying lots in the area surrounding the Monroe since about 1987.

4. According to the Preservation Board, the Monroe is the last remaining apartment building designed by Washington architect Albert Goenner. In describing the building, the Preservation Board said:

> The four-story brick and sandstone building features Classical Revival details on its primary facade, which was designed to suggest two bayfront rowhouses joined with a central entrance. The Landmark is the last remaining apartment building designed by Goenner, a prominent local architect noted for his innovative apartment designs.

nomic hardship," which would entitle Scoville under the Preservation Act to obtain a permit to raze the building.[5]

On July 22, 1992, the DCPL notified the DCRA that it would oppose Scoville's application, and several days later it submitted a statement of its reasons for doing so. According to the DCPL, the Monroe had been in excellent condition until Scoville purchased it in 1990,[6] but since that time two fires had extensively damaged the building. The first fire occurred on January 10, 1991, less than one week before the Monroe was designated as a historic landmark. Although the fire department concluded that only minimal damage resulted from this blaze, on-site observations by the DCPL revealed that the westernmost bay on all four floors had been destroyed and that the front entrance was no longer sealed.

The second fire took place on June 19, 1992, less than a month after the Preservation Board recommended that Scoville's demolition application be denied. This fire caused more widespread damage to the building. To stabilize the structure after this fire, the Building and Land Regulation Administration on July 17, 1992, issued a permit to Scoville for partial demolition so that "imminently dangerous and unsafe portions" of the building could be removed. The DCPL also noted that between January 1991 and June 1992 "small amounts of the front facade were incrementally chipped away." Finally, the DCPL alleged that Scoville had violated the partial demolition permit issued on July

17 by conducting "significant demolition of the Monroe" on July 20 and 21, 1992.

On August 5, 1992, a public hearing was convened before the Mayor's agent.[7] The DCPL called three witnesses and introduced eighteen exhibits in support of its position that Scoville's application should be denied. The first witness was Steven Callcott, a former DCPL employee, who testified about the Monroe's changing condition between January 1991, the month in which it became a historic landmark, and June 1992. During that period, Callcott said, the Monroe had undergone "a piecemeal sort of demolition" in the aftermath of the two fires, especially the first one. Supporting his testimony with a series of photographs taken between February 1990 and June 1992, Callcott observed that the Monroe was in remarkably good condition before its sale to Scoville, but that under Scoville's ownership the building had drastically deteriorated.

Jacqueline Prior, the executive director of the DCPL, testified that in her opinion the Monroe was still salvageable, despite its dilapidated condition, although restoring the building would be time-consuming and costly.[8] Steven Raiche, the chief of the Historic Preservation Division of the DCRA, testified that the permit issued on July 17, 1992, did not allow Scoville to raze the Monroe, but gave only limited authorization to stabilize the building in the wake of the June fire. Both Prior and Raiche noted that the Monroe's rate of deterioration while under Scoville's ownership greatly exceeded the normal

---

5. Scoville later abandoned this claim because, as it alleges in its brief, "no one has ever won an 'economic hardship' case" in the District of Columbia.

6. In his written findings of fact, the Mayor's agent found that at the time Scoville purchased the Monroe,

> most, if not all, of the window panes on the third and fourth floor[s] were intact. At least some of the Monroe's windows contained shades.... At that time, the masonry of the facade was completely intact, including significant architectural detail surrounding the entrance as well as both below and above the fourth floor windows, [although] there is a dispute as to its stability at that time.... The entrance and windows of the basement, first and second floors were well-secured by

boards.... Both the east and west bays of the Monroe were completely intact, although in a dilapidated condition.... By January 12, 1991, after several small fires, the west bay of the Monroe's facade was significantly destroyed. In addition, the ornamental work around the door had been demolished.

7. Scoville failed to appear at this hearing. The Mayor's agent, however, decided to proceed with the hearing and to consider at the end whether to allow Scoville to present evidence at a later date.

8. Ms. Prior was qualified as an expert in the rehabilitation of buildings. She was asked to give an opinion about whether the Monroe could be restored "based on [her] experience dealing with the restoration of other historical landmarks...."

wear and tear of similar buildings. At the close of the hearing, the Mayor's agent tentatively denied Scoville's application, but then decided to hold a further hearing at which Scoville could present evidence.

The second hearing, at which counsel for Scoville was present, took place a few weeks later. Scoville's first witness, Edward Jones, was hired by Scoville to perform the partial demolition in mid-July. Jones testified that the demolition was carried out in accordance with the permit issued by the Building and Land Regulation Administration. Scoville also called Satish Shah, a structural engineer, who examined the Monroe on two occasions, the first in late August 1992. At that time he noticed that the Monroe had sustained significant damage on the first floor and that a support beam over the front entrance was loose and potentially hazardous. He also saw that several of the balconies on the third floor were missing and that the top floor was in a deteriorated state. Shah concluded that the building was unsafe. James Jennings, an architect and an expert in historic preservation, testified that the front facade of the building was completely missing and that other historically significant aspects of the building were either damaged or gone. Commenting on the historical value of what was left of the building, Jennings said that the most historically significant parts of the building had been destroyed.[9]

James Shelton, a construction inspector for the DCRA, testified that on a visit to the Monroe on July 17, 1992, he noticed that the east wing of the structure was "in bad shape." As a result, Shelton's supervisor, Vincent Ford, issued a "violation notice" stating that the building was "unsafe and dangerous" and directed Scoville to raze the east portion of the building down to the bottom of the fourth floor, rather than to the window sill as specified in the permit. Shelton testified that the partial demolition of the Monroe was conducted mostly in accordance with the limited permit, although in "some areas" Scoville "took some liberties."[10]

Jerry Sills testified that the building was vacant when he bought it for Scofield and that, upon learning of its designation as a historic landmark, he took steps to secure and preserve it. He said that, after the partial demolition in July, he erected a fence around the site and directed an employee to monitor the building from time to time. Sills denied allegations that he intentionally destroyed the building or allowed it to deteriorate.

The final witness for Scoville was Mrs. Lu Lee, who described how the Monroe, which she conceded was "a beautiful building," had been transformed into "a haven for all these drug addicts and prostitutes, and all kinds of illegal activities." Mrs. Lee had organized a neighborhood committee to seek the removal of the Monroe from the list of historic landmarks so that it could be demolished.

In rebuttal, the DCPL called James Shemro, a structural engineer, who testified that there was no apparent reason why the porches on the west side of the building needed to be destroyed during the partial demolition in July 1992. In fact, Shemro said, the removal of these porches may have had a destabilizing effect on the building.[11] Shemro also opined that the Monroe was capable of being fully refurbished and restored so as to be commercially viable.

9. Referring to the overall condition of the building, Jennings remarked, "[T]hings were a shambles, essentially. The apartments themselves are not spectacular. There's not a great amount of detail—historic, architectural or otherwise."

10. These "liberties" included the removal of the balconies or porches on the west facade, which were not mentioned in the permit, and the failure to stack the custom masonry. Neither of these infractions resulted in the issuance of a violation notice.

11. Mr. Shah had testified earlier that the removal of the porches did in fact damage the structural stability of the building, particularly the surrounding masonry.

Whether the porches had been properly destroyed was a major issue throughout the hearing. According to counsel for Scoville, the removal of the porches was done with the tacit approval of the District of Columbia government, in the presence of District officials. Jacqueline Prior testified, however, that when the issue of the porches arose, city officials instructed Scoville's construction workers that "it was not necessary to remove the porches."

## B. *The Decision of the Mayor's Agent*

A few months after the hearing, the Mayor's agent granted Scoville's application for a demolition permit, but ordered that any future construction on the site "meet the historic preservation standards for the Monroe building including that such structure . . . not exceed in height or square footage that of the Monroe building." The Mayor's agent based this ruling on his conclusion that the remaining portions of the Monroe were devoid of "any historical significance" and that "[t]he shell that remains on the property is clearly unsafe. . . ." In addition, he noted that "rebuilding from the existing structurally unsafe shell would be more expensive than destroying the shell and rebuilding."

In restricting the future use of the property, the Mayor's agent found that Scoville had "clearly created or exacerbated" much (but not all) of the damage to the Monroe, thereby violating its legal duty as the owner of a historic landmark to preserve and maintain it. The Preservation Act, he said, deems a historic landmark to be a "treasure" and regards the owner of such a landmark to be "a joint trustee, with the District [of Columbia], of that treasure." Under the Act, "the preservation of our District's treasures is mandatory. And no owner may abuse [that] trusteeship by allowing deterioration of any one of our treasures." His order thus required that any future construction on the land now occupied by the Monroe "must first obtain approval under the Historic Preservation Act to assure that it is consistent with the landmark so designated."

## II

The demolition of a historic landmark in the District of Columbia is restricted by D.C.Code § 5–1004, which is part of the Preservation Act. Subsection (e) of section 5–1004 provides:

No permit [to demolish a historic landmark] shall be issued unless the Mayor finds that issuance of the permit is necessary in the public interest, or that failure to issue a permit will result in unreasonable economic hardship to the owner.

Another section of the Preservation Act, D.C.Code § 5–1002(10), defines "necessary in the public interest" as "consistent with the purposes of this subchapter as set forth in § 5–1001(b) or necessary to allow the construction of a project of special merit." [12] The cited section, in turn, states that the Preservation Act has two purposes with respect to historic landmarks: "(A) To retain and enhance historic landmarks in the District of Columbia and to encourage their adaptation for current use; and (B) To encourage the restoration of historic landmarks." D.C.Code § 5–1001(b)(2).

Against this statutory backdrop, the DCPL maintains that the Mayor's agent lacked authority to order the issuance of a demolition permit because none of the exceptions permitting the demolition of a historic landmark applies in this case. Scoville contends, on the other hand, that "nothing in [the Preservation Act] precludes a hearing officer from ordering that the derelict shell of a former landmark be demolished in the interest of public safety, and further requiring the rebuilding of the landmark in the future." Scoville further asserts that the decision of the Mayor's agent will ultimately advance the goals of the Preservation Act— the protection, enhancement, and restoration of historic landmarks—by requiring that any future development of the site conform to the historic preservation standards for the Monroe. Moreover, since many of the historically important features of the Monroe have been destroyed, Scoville argues that there is no reason to preserve the remaining portions of the building. For the reasons which follow, we conclude that Scoville and the Mayor's agent have misconstrued the scope of the Mayor's agent's authority.

■■■■ To uphold an order issued by the Mayor's agent under the Preservation Act, we must determine that the agent's written factual findings are supported by substantial evidence in the record and that his legal conclusions flow rationally from those findings. *Committee of 100 on the Federal City v. Department of Consumer & Regulatory Affairs,* 571 A.2d 195, 199 (D.C.1990); *Com-*

---

**12.** Scoville concedes that the "special merit" exception is inapplicable in this case.

*mittee for Washington's Riverfront Parks v. Thompson,* 451 A.2d 1177, 1193 (D.C.1982); *Don't Tear It Down, Inc. v. District of Columbia Department of Housing & Community Development,* 428 A.2d 369, 378 (D.C. 1981). The Mayor's agent, like any administrative agency, must operate within the applicable statutory constraints in performing his assigned task. D.C.Code § 1–1510(a)(3)(C) (1992); *see Davidson v. District of Columbia Board of Medicine,* 562 A.2d 109, 112 (D.C. 1989) (administrative agencies must abide by their enabling statutes); *Chesapeake & Potomac Telephone Co. v. Public Service Commission,* 378 A.2d 1085, 1089 (D.C.1977) (commission has only those powers delegated to it by statute). It is in this respect that the Mayor's agent went astray.

■ To begin with, the order of the Mayor's agent failed to cite any of the enumerated grounds on which the Mayor or her agent may permit the demolition of a historic landmark. Given Scoville's concession that neither the economic hardship exception nor the special merit exception applies in this case, the Mayor's agent had to conclude that demolition of the Monroe would either "retain and enhance historic landmarks in the District of Columbia and ... encourage their adaptation for current use" or "encourage the restoration of historic landmarks." D.C.Code § 5–1001(b)(2)(A)–(B). The order of the Mayor's agent, however, reached neither conclusion.

In paragraph 66 of his order, the Mayor's agent wrote, "To encourage the historic preservation of our District is the public interest requirement. This means encouraging the rejuvenation of our landmarks and historic districts. *It also means ... balancing between the various interests in the historic preservation.*" (Emphasis added.)[13] From this unauthorized legal premise the Mayor's agent drew his faulty conclusion to grant Scoville's application for the demolition permit. There is nothing in the Preservation Act that allows the Mayor's agent to engage in a balancing of interests which takes into account such factors as the cost of refurbishing the dilapidated structure and the threat it poses to the safety and welfare of the community. On the contrary, the limited task of the Mayor's agent is to evaluate a demolition application in accordance with the Preservation Act, *and nothing more. See* D.C.Code § 5–1004(a) ("the Mayor [or her agent] shall review the permit application in accordance with this section").

In considering an application for a demolition permit, the relevant factual inquiry depends on the specific provision of the Preservation Act invoked by the applicant. When the applicant relies on the "unreasonable economic hardship" exception, D.C.Code § 5–1004(e), an inquiry into the cost of revitalizing a building is not only relevant but required. *See MB Associates v. D.C. Department of Licenses, Investigation & Inspection,* 456 A.2d 344, 345 (D.C.1982) (rejecting reliance on economic hardship exception when structural engineer testified that repairs were feasible and applicant had made no attempt to sell building after its designation as a historic landmark). In addition, in "special merit" cases, D.C.Code § 5–1002(10), this court has held that "economic feasibility is ... one factor to be considered in determining whether to allow demolition." *Committee of 100, supra,* 571 A.2d at 202 (footnote omitted).

In this case, however, Scoville based its application on the more general "necessary in the public interest" standard of section 5–1004(e), which in turn is defined,[14] to the extent here relevant, as "consistent with the purposes of [the Preservation Act] as set forth in § 5–1001(b)...." With respect to historic landmarks, those statutory "purposes" are exclusively concerned with the retention, restoration, and adaptation of historic buildings. The relative cost of refur-

---

13. In the next paragraph, the Mayor's agent discussed the factors supporting Scoville's application:

> There is no question that rebuilding from the existing structurally unsafe shell would be more expensive than destroying the shell and rebuilding. Furthermore, maintaining the un-

safe attractive nuisance of the Monroe shell aids [*sic*] to the discouragement of the rejuvenation of the historic landmarks in its vicinity.

14. The definition appears in D.C.Code § 5–1002(10).

bishing an existing structure, as opposed to destroying it and building a new structure, is an extraneous factor which the Mayor's agent may not consider, and we hold that in this case he erred in doing so.

■ Similarly, the Mayor's agent under the Preservation Act has no authority to order the demolition of a historic landmark in the interest of the health, safety, and welfare of the community. While such factors are of unquestionable public importance, there is no statutory basis for a Mayor's agent *appointed under the Preservation Act* to consider them. *See Baker v. District of Columbia*, 494 A.2d 1299, 1302–1303 (D.C.1985) (agency must abide by its enabling statute regardless of public policy considerations to the contrary); *accord, e.g., Ramos v. District of Columbia Department of Consumer & Regulatory Affairs*, 601 A.2d 1069, 1072 (D.C. 1992). Instead, the Mayor and her agents have the power under the Unsafe Structures Act, D.C.Code §§ 5–601 through 5–608,[15] to examine and remove any unsafe conditions on private property. Under the Unsafe Structures Act, however, the Mayor must abide by certain procedural requirements before removing the dangerous portions of a structure. In the present case, the Mayor appointed an agent only under the Preservation Act; as such, he could not even consider the possible dangers associated with the Monroe.[16]

Moreover, as the DCPL notes in its brief, the legislature has vested in the Board for the Condemnation of Insanitary Buildings and the Condemnation Review Board the authority to order the demolition of buildings that endanger the health or lives of their occupants and neighbors. *See* D.C.Code § 5–702(a). It is true that under D.C.Code § 5–713 any property owner "affected by an order of condemnation" may challenge that order before the Mayor or her agent. In such cases, however, the Mayor's agent derives his or her authority not from the Preservation Act but from a different statute, the Insanitary Buildings Act, which gives the Mayor different powers. The Mayor's agent in this case could not legally invoke those powers because he was acting under the Preservation Act, not the Insanitary Buildings Act.

■ The Mayor's agent included in his order a provision restricting the Monroe's future development. Here again, the Mayor's agent was without authority to impose such a restriction. "Absent express statutory or regulatory authority, a regulatory agency may not impose remedial measures." *Davidson v. District of Columbia Board of Medicine, supra*, 562 A.2d at 112; *see Ramos, supra*, 601 A.2d at 1073 (administrative agencies, unlike courts, have no equitable power to fashion remedies not expressly authorized by statute). While the Mayor's agent is not a permanent administrative component of the District of Columbia government, he has been authorized by the Council of the District of Columbia to perform the executive function of issuing demolition permits for historic landmarks. He is thus bound by the terms of the Preservation Act in rendering a decision and in formulating a remedy. Since the Preservation Act contains no language authorizing the Mayor (or her agent) to limit the future use of a site once occupied by a historic landmark, we hold that the Mayor's agent exceeded his authority in doing so in this case.

■ For the same reason, we reject the DCRA's suggestion that the Mayor's agent should be allowed to impose a restrictive covenant on the lot so that any future development of the property would conform to the specifications of the Monroe. Such a covenant, as proposed by the DCRA, would also include a third-party right of enforcement enabling non-profit organizations, like the DCPL, to take legal action to compel compliance with the covenant. There is absolutely nothing in the Preservation Act giving to the Mayor (or her agent) any authority to place such a restriction on future use of the land—

---

15. The Preservation Act specifically states that it does not limit in any way "the authority of the District of Columbia to secure or remove an unsafe building or structure pursuant to the [Unsafe Structures Act]." D.C.Code § 5–1011(b).

16. At oral argument, counsel for the DCRA acknowledged that the Monroe is probably not dangerous enough for demolition under the Unsafe Structures Act.

except perhaps in connection with projects of special merit, a matter that we need not decide here—and thus we hold that the Mayor (or her agent) cannot do so. *See Ramos, supra,* 601 A.2d at 1073.

## III

■ Having concluded that the Mayor's agent exceeded his authority in doing what he did, we must now consider what is to be done with the Monroe. For the reasons we have already discussed, we must send the case back to the Mayor's agent with directions to deny Scoville's application for a demolition permit. After that is done, the Mayor's agent will have two options. One is to refer the case to the Corporation Counsel, who would then initiate proceedings under D.C.Code § 5–1010(b). That section provides:

> Any person who demolishes, alters, or constructs a building or structure in violation of § 5–1004, § 5–1005, or § 5–1007 shall be required to restore the building or structure and its site to its appearance prior to the violation. Any action to enforce this subsection shall be brought by the Corporation Counsel. This civil remedy shall be in addition to and not in lieu of any criminal prosecution and penalty.

This appears to be an appropriate course, given the factual finding of the Mayor's agent that Scoville was largely responsible for the Monroe's rapid decline.[17] Indeed, the Mayor's agent found not only that Scoville "clear-ly created or exacerbated" the Monroe's deteriorated state, but also that Scoville was responsible for the destruction of its most important features.[18] Moreover, as the Mayor's agent observed, expert testimony at the hearing supported the DCPL's position that the Monroe is not beyond salvation. James Shemro, a structural engineer, and Jacqueline Prior, a historic preservation specialist, testified that buildings in similar condition to the Monroe have been restored as part of viable economic developments. In short, proceedings under section 5–1010(b) would achieve, at least in theory, the desired twofold effect of having the Monroe refurbished to the extent possible and requiring Scoville to pay for its restoration.[19]

The other possibility, in light of the potential health and safety hazards posed by the Monroe in its present condition, would be to refer this case to the Board for the Condemnation of Insanitary Buildings. That Board, in turn, could then determine whether the Monroe should be repaired or demolished[20] and issue an appropriate order under D.C.Code § 5–705. That decision, however, is for the Board to make if the case is presented to it. It is not a decision for the Mayor's agent—or for this court.

The order of the Mayor's agent granting Scoville's application to demolish the Monroe is reversed, and this case is remanded to the Mayor's agent with directions to deny the application. The Mayor's agent shall then refer it either to the Corporation Counsel, who would then institute proceedings under

17. In particular, the Mayor's agent noted in his order that Scoville had directly violated the partial demolition permit issued on July 17, 1992, and that its violation had resulted in the destruction of the building's facade, the entire fourth floor (instead of just a portion of the fourth floor as specified in the permit), and the balconies on the west side of the building.

18. In paragraph 40 of his order, the Mayor's agent noted that "[t]he most historically significant pieces of the building—the facade, the front entrance and the balconies—are gone." Of these features, the Mayor's agent previously had found Scoville responsible for the destruction of two of them, the facade and the balconies. See note 17, *supra.*

19. A few days before oral argument, we were advised that Scoville has recently filed a bank-ruptcy petition. We thus recognize that the ultimate fate of the Monroe may depend, in part at least, on the outcome of the bankruptcy proceedings. Nevertheless, we are convinced that, as a matter of law, the only option available to the Mayor's agent under the Preservation Act was to deny the application for a demolition permit.

20. The Condemnation Board is expressly authorized by statute to order the demolition of a historic landmark, but even then, the issuance of a demolition permit must meet the requirements of the Preservation Act. See D.C.Code § 5–1011(a). If the owner of the building fails to pay the cost of demolition, that cost "shall be assessed by the Mayor ... as a tax against the premises on which such building ... was situated...." D.C.Code § 5–707(a). We emphasize that this would be a tax on the property itself, not on its bankrupt owner.

D.C.Code § 5–1010(b), or to the Board for the Condemnation of Insanitary Buildings so that it may begin condemnation proceedings under the Insanitary Buildings Act. The Mayor's agent, on remand, may conduct such proceedings as may be necessary to assist him in choosing between these two alternatives.

*Reversed and remanded.*