*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-AA-466

DISTRICT OF COLUMBIA OFFICE OF TAX AND REVENUE, PETITIONER,

v.

JOHN R. SHUMAN and SARA G. SHUMAN, RESPONDENTS.

Petition for Review of a Final order of the
District of Columbia Office of Administrative Hearings
(OTR-00008-11)

(Submitted October 22, 2013                    Decided December 19, 2013)

*Irvin B. Nathan*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, *Donna M. Murasky*, Deputy Solicitor General, *Mary L. Wilson*, Senior Assistant Attorney General, were on the brief for petitioner.

John R. Shuman and Sara G. Shuman, *pro se*, filed a statement in lieu of brief.

Before THOMPSON, *Associate Judge*, and WAGNER and SCHWELB, *Senior Judges*.

SCHWELB, *Senior Judge*: In the 1984 film "The Terminator" – a work of fiction starring Arnold Schwarzenegger – artificially intelligent machines attempted to exterminate what was then left of the human race. In the appeal now before us, a man-made computer system did not go so far but, defying the will of those who programmed it, it caused significant grief and distress to those who had

a right to rely on its accuracy. Unfortunately, the machine involved belonged to the branch of the District of Columbia government responsible for calculating and collecting citizens' taxes. In this case, we are charged with resolving a controversy that had its inception in an erroneous data entry made almost a decade ago into the computer system of the District of Columbia's Office of Tax & Revenue (OTR), and OTR's errant computer program has played a key role in the litigation.

The taxpayers affected by this unfortunate data entry are respondents John R. Shuman and Sara G. Shuman. It is now undisputed that the Shumans were entitled to a refund of $790 from OTR with respect to their 2004 tax return, but this amount was mistakenly entered into OTR's computer system as tax due from the Shumans. This erroneous entry, and the prolonged inability of OTR (apparently continuing to the present day) to correct it, have caused repeated and vexatious problems for the taxpayers, cost the District and its agencies a great deal of money, and raised troubling questions as to what, if any, authority the District's Office of Administrative Hearings (OAH) may have to provide an effective remedy, and as to whether the controversy was litigated in the appropriate forum.

In this case, in the order under review, an Administrative Law Judge (ALJ)

of the OAH granted extensive monetary and equitable relief, including the equivalent of an injunction, the imposition of conditional monthly fines potentially adding up to many tens of thousands of dollars, and the unconditional transfer of a large amount of money from one District agency (OTR) to another (OAH). Such remedies, to the extent that they are precedented at all, have heretofore been associated with contempt proceedings before judicial rather than administrative bodies. We conclude that the ALJ exceeded her authority in granting the relief that she did, and we therefore reverse her decision and vacate the ALJ's order, without prejudice to any proceedings the Shumans may choose to institute in the Superior Court and any defenses that OTR may assert in that forum.

## I. FACTUAL BACKGROUND

Because of the complexity of this controversy and the repeated failure of OTR to correct its errors and to avoid future mistaken claims against the Shumans, we recite the history of the case in some detail. The Shumans timely filed a joint income tax return in the District of Columbia for the 2004 tax year, and they paid the tax due in full. The following year, the Shumans filed an amended return and requested a refund in the amount of $790, which OTR duly issued to them. Two

years later, however, on September 13, 2007, OTR sent the Shumans a "Statement of Account" advising them that they owed the District $790, together with interest and penalties, for the 2004 tax year. Believing this claim to be unfounded, the Shumans promptly contacted OTR and requested that the error be corrected. On September 21, 2007 OTR issued another Statement of Account and effectively confessed error, acknowledging that the Shumans had no outstanding tax liability for 2004. The unfounded claim was thus withdrawn.

When the Shumans filed their return for the 2007 tax year, however, they requested a refund for that year in the amount of $4,132. OTR issued a refund check in their favor, but for only $3,342, which was $790 less than the amount requested. Undoubtedly more astonished than pleased, the Shumans immediately inquired about the reduction of their refund, and they were once again reassured that they would receive the balance. Nevertheless, on March 13, 2008, OTR sent the Shumans a "Notice of Offset" advising them that OTR had reduced their refund for the 2007 tax year by $790 in order to satisfy an alleged tax liability for 2004. By this time, the Shumans may have been a trifle bewildered, for the effective confession of error which they had received half a year earlier had apparently come to naught. On August 25, 2008, seeking a prompt and inexpensive remedy, the

Shumans brought OAH into the case by filing a "Taxpayer's Protest of a Proposed Assessment" with that agency. The Shumans requested OAH to rule that OTR was required to issue a $790 refund, which reflected OTR's error as to the 2004 tax year and, consequently, the amount by which OTR had improperly reduced the Shumans' refund for the 2007 tax year. A few days later, however, on September 4, 2008, OTR sent the Shumans another Notice of Offset, reiterating that their refund for 2007 would be reduced by $790.

At this point, having noted the discrepancies, OTR apparently launched an investigation and discovered that the incorrect offset notices had been sent to the Shumans as a result of the erroneous information, described at the outset of this opinion, which had been entered into OTR's computer system with respect to the 2004 tax year. Specifically, the $790 refund that the District owed *to* the Shumans for 2004 had been mistakenly entered into the system as an amount owed by the Shumans to the District. On October 2, 2008, the ALJ, who has handled this matter on behalf of OAH throughout these proceedings, exercised jurisdiction over the case without immediate objection by OTR, and she held a status conference. A representative of OTR agreed at this conference that the Shumans were entitled to receive a refund check for the amount in dispute. OTR did indeed send the

Shumans a check for $790 on October 21, 2008, as it had agreed to do, but OTR seemingly nullified this action by issuing a new Notice of Offset on October 28, 2008, again claiming that the Shumans owed $790 in unpaid taxes for the 2004 year. In addition, OTR sent the Shumans a refund check for $1,799.76, but simultaneously issued an offset notice for $19,151. According to OTR, both of these items pertained to the 2004 tax year.

On January 15, 2009, the ALJ held another status conference to try to resolve the issues raised by the most recent claims. In conformity with an assurance provided at this status conference, OTR certified that the Shumans would have no tax liability for tax years 2004 to 2007 if they returned the erroneously issued $1,799.76 refund check. The ALJ issued a final order on February 2, 2009, directing the Shumans to return this check, and she ordered that the case be dismissed without prejudice when that had been accomplished.

This should surely have ended the matter, but it did not. On account of persistent problems with its computer system, OTR continued to issue erroneous forms and notices to the Shumans regarding the $790 refund. OTR issued an Internal Revenue Service ("IRS") Form 1099-G for tax years 2004 and 2007, in

which it incorrectly alleged that the Shumans had received $23,891 and $7,292 in refunds for those years. In response, on February 9, 2009, the Shumans moved to reopen the case, asserting that they had not received refunds in the claimed amounts. At this point, half a year after the Shumans had complained to OAH, OTR argued for the first time that OAH lacked jurisdiction over "information" returns such as the IRS Form 1099-G because these forms do not assess a tax, and because OAH's statutory jurisdiction is limited to dealing with tax assessments. This claim of lack of jurisdiction is one of OTR's principal contentions before this court.

On February 26, 2009, OTR sent the Shumans still another Notice of Offset, now asserting that the Shumans' refund for the 2004 tax year should be reduced by $1,580, which of course is $790 doubled. The Shumans promptly filed an amended motion to vacate the dismissal and to reopen the case. On March 16, 2009, the ALJ granted the motion to reopen, and she stayed the motion to vacate dismissal pending a status conference. At that conference, Pamela Westray, then operations manager for OTR's Customer Service Administration, explained that a "glitch" in OTR's computer system had caused the computer to generate the erroneous notices automatically. Ms. Westray believed that she could override the

automatic generation of the notices by "suppressing" the Shumans' account for 2004 and by "writing off" the incorrect outstanding balance.  As we shall see, however, it turned out that she was mistaken; the computer system, though inanimate, would not be so easily diverted.

On April 13, 2009, following the status conference, the ALJ issued an order  directing OTR to "suppress" the Shumans's accounts for the tax years 2004 to 2007, and to submit written proof of compliance with her order within 30 days. She also warned that if OTR sent another erroneous notice claiming tax due for the 2004 tax year, despite its certification that the Shumans had no further obligations for 2004, OTR would be subject to potential monetary sanctions for failure to comply with a lawful order.  *See* D.C. Code § 2-1831.09 (b)(8) (2001).  The ALJ directed that the case remain open for six months, so that OTR's compliance with the order could be monitored.  On December 29, 2009, the Shumans not having received any tax bills or notices concerning 2004 for more than six months, the ALJ again ordered that the case be closed.  In her order, however, the ALJ included the caveat that "a[n]y further indication of *OTR* or *its computers* or contractors sending another offset notice or a tax bill or taking any other action to collect monies relating to [the Shumans'] 2004 tax year account will subject

Respondent OTR to the possibility of a monetary sanction being imposed." In other words, the ALJ was now going well beyond determining whether the Shumans' protests were correct, and essentially enjoining OTR from sending any further incorrect notices or bills, with possible monetary sanctions looming in the background.

## II.  ENFORCEMENT PROCEEDINGS

Enforcement issues first arose with a (comparatively) minor reporting violation.  OTR failed to submit written proof of compliance with the order by the 30-day deadline, and the ALJ ordered OTR to show cause why sanctions should not be imposed.  OTR responded that it had suppressed the Shuman' accounts within the deadline as ordered, but acknowledged that it had failed to submit proof of compliance to OAH.  It does not appear that any specific sanctions were issued as a result of this purely procedural failure on the part of OTR, although the ALJ did mention it in her Final Order on Sanctions.

Meanwhile, on June 3, 2009, the Shumans received a letter from MuniServices LLC, a company that had a contract with OTR under which it was to identify taxpayers who were believed not to have paid all of the taxes owed by

them to the District of Columbia. According to MuniServices, the Shumans had potential additional tax obligations as a result of their allegedly having done certain kinds of business in the District. The Shumans responded that during the relevant time period, they had not conducted in the District any of the types of business described in the letter. At the hearing on the order to show cause, OTR acknowledged that its suppression of the Shumans's accounts had not been communicated to MuniServices, which collected its information from a separate data base. In addition, after the case had been closed, the Shumans received another IRS Form 1099-G in which OTR erroneously reported that they had received a refund of $1,580 in 2009 for the 2004 tax year. OTR also issued new Notices of Offset on March 14, 15, and 16, 2011, all of which related to the computer glitch surrounding the Shumans' tax account for the 2004 tax year. At this point, three and one half years after OTR had first confessed error, the Shumans again moved to reopen the case and requested that the ALJ enforce her final order and impose sanctions.

On May 11, 2011, the ALJ held a hearing to determine what, if any, sanctions would be appropriate. OTR's witnesses testified that although OTR had tried on numerous occasions to correct the Shumans' accounts, the computer

system would not allow the attempted corrections to be preserved. OTR had written off the $790 as uncollectable, but the computer system had failed to recognize the write-off once it appeared that money was available to pay off the supposed bad debt. OTR also presented testimony to the effect that the problems with the ten-year-old computer program could not be resolved unless it was replaced by an entirely new system. OTR, in other words, protested that it was powerless to control the actions of its own computers, and that there was nothing that OTR could do about it. As Mr. Shuman testified, however, "[i]t is a sad day when computers rule man. There must be human accountability for actions by governments. It is too simple to just blame a machine or program for one's ills." Following the hearing, the Shumans notified the ALJ that OTR had sent them a refund check for $790, dated May 16, 2011, and a Notice of Offset in the amount of $1,380, dated May 23, 2011

On December 20, 2011, the ALJ issued the Final Order on Sanctions which is the subject of this Petition for Review. The ALJ found that "OTR willfully failed to comply with this court's numerous orders to stop sending erroneous offset notices and refund checks to [the Shumans] for the past two years." She concluded that "OTR's conduct has created prejudice to the judicial system" by wasting

OAH's resources and by delaying the litigation of other cases.[1]  With respect to OTR's defense that it was not responsible because the computer program was at fault, the ALJ would have none of it.  She wrote:

> It is inconceivable that the District of Columbia Office of Tax and Revenue is willing to continue to blindly rely on a computer program that it knows produces erroneous documents and then sends the erroneous documents to taxpayers, apparently without either the knowledge or intervention of any OTR staff. It is further disconcerting that OTR made next to no attempt to remedy the problem while aware that taxpayers across the District will likely continue to receive incorrect notices of offset and refund checks as a result of its continuing errors. Moreover, the erroneous refund checks and Notices of Offset can create serious IRS tax implications for the affected parties.

Turning to the remedy to be imposed, the ALJ analogized OTR's actions to the type of conduct that warrants sanctions for civil contempt, criminal contempt, discovery violations, and unnecessary consumption of judicial resources.  She ordered OTR to pay $80,825.26, with interest, to OAH.  This award, according to the ALJ, represented "the amount of money OTR erroneously claimed in Notices of Offset or distributed to [the Shumans] in erroneous checks, all regarding their

---

[1]  The ALJ apparently assumed that the proceeding before OAH is part of the "judicial system."

2004 tax account year." In addition, the ALJ imposed fines of $250 per day for the first month after December 31, 2011, if OTR failed to "comply with [her] orders and correct the malfunctions in its computer system or replace[] that system with one that functions"; $350 per day for the second month; $450 per day for the third month; and an additional $100 per day each month thereafter. The daily fines were thus to begin less than two weeks after the entry of the order.

On December 30, 2011, OTR moved for reconsideration of the final order on sanctions, for a stay of the final order, and for dismissal of the proceedings for lack of jurisdiction. OTR argued that OAH lacked jurisdiction over claims for refunds, and that even assuming that it did have jurisdiction, the ALJ was without authority to order OTR to repair or replace its computer system, or to impose monetary sanctions for failure to comply with the ALJ's orders. In the alternative, OTR asserted that it had in fact complied with the orders. OTR also submitted an affidavit from James Spaulding, the Associate Deputy Chief Financial Officer of the District of Columbia Office of Budget and Planning, in which he represented that funds for replacing OTR's computer system could be provided only from a capital budget extending through fiscal year 2016, so that any attempt to implement the ALJ's order would take several years to complete.

On March 15, 2012, in detailed separate orders, the ALJ denied all three motions. She construed the Notices of Offset that OTR had sent to the Shumans as Notices of Proposed Deficiency, equivalent in substance to proposed assessments, and she therefore concluded that OAH had jurisdiction over the matter. The ALJ also held that she had acted within OAH's statutory authority when she imposed monetary sanctions for OTR's failure to comply with her order to discontinue sending erroneous notices and tax bills to the Shumans. She concluded that, contrary to OTR's assertion, the remedies she had granted did not constitute equitable relief. The ALJ also reasoned that because her order was necessary to regulate the proceedings of the case, *see* D.C. Code § 2-1831.09 (b)(7), "this administrative court had authority to order OTR to fix its computer system, because it fell within the scope of 'regulating the proceedings.'" *Id*. The ALJ further commented that OTR could have complied with the order requiring it to discontinue sending incorrect notices to the Shumans by "designat[ing] an employee to screen offset notices and remove any offset notice or other tax bill relating to [the Shumans'] 2004 tax return addressed to [the Shumans] prior to mailing." Finally, the ALJ concluded that she was authorized to impose monetary sanctions against non-compliant parties, including other District of Columbia

agencies, pursuant to § 2-1831.09 (b)(8), which (with exceptions not here relevant) permits administrative law judges, to "[i]mpose monetary sanctions for failure to comply with a lawful order."

Following the denial of its motions, OTR asked this court to summarily reverse the ALJ' s order or, in the alternative, to stay the order pending its review by this court. The Shumans did not file a response, and they have not played an active part in the proceedings before this court. On May 25, 2012, this court denied the motion for summary reversal but granted the requested stay pending further order of this court. The stay remains in effect.

### III. ANALYSIS

In its brief, OTR contends (1) that OAH lacked jurisdiction over the case; (2) that, assuming jurisdiction, OAH lacked the remedial authority which the ALJ purported to exercise; and (3) that, on the merits, the ALJ's order was arbitrary and capricious. We largely reject OTR's first contention, agree with the second, and do not reach the third.

## A. JURISDICTION

Whether OAH had jurisdiction over this proceeding depends entirely on whether or not its exercise of jurisdiction was authorized by statute or regulation. *Ramos v. District of Columbia Dep't of Consumer & Regulatory Affairs*, 601 A.2d 1069, 1073 (D.C. 1992). "An administrative agency is a creature of statute and may not act in excess of its statutory authority." *See, e.g.*, *District Intown Props., Ltd. v. District of Columbia Dep't of Consumer & Regulatory Affairs*, 680 A. 2d 1373, 1379 (D.C. 1996); *Spring Valley Wesley Heights Citizens Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 644 A.2d 434, 436–37 (D.C.1994); *Davidson v. District of Columbia Bd. of Medicine*, 562 A.2d 109, 112 (D.C.1989). "The purported exercise of jurisdiction beyond that conferred upon the agency by the legislature is *ultra vires* and a nullity." *District Intown*, 680 A.2d at 1379 (citing *Auger v. District of Columbia Bd. of Appeals & Review*, 477 A.2d 196, 209 (D.C. 1984)).

The authority of OAH over tax protests is governed by the Tax Clarity Act of 2000, D.C. Code §§ 47-1330 *et seq.*, and by the Office of Administrative Hearings Establishment Act of 2001, D.C. Code §§ 2-1831.01 *et seq*. The Tax Clarity Act provides, in pertinent part:

> Unless otherwise provided in this title, before a final assessment of a deficiency, interest, or penalties against a person, the Mayor shall send the person a proposed assessment. No later than 30 days after the proposed assessment is sent, the person may file a protest with the Office of Administrative Hearings, and shall serve a copy on the Mayor.

§ 47-4312 (a). "If a protest is filed in a timely manner . . . the Mayor may not issue a final assessment of the deficiency, interest, or penalties, and the Office of Administrative Hearings shall decide, after providing an opportunity for a hearing, whether the deficiency, interest, or penalties are proper." § 47-4312 (c). With exceptions not pertinent here, "a final order of [OAH] in any matter in which a protest has been filed shall have the same effect as a final assessment of a deficiency, interest, or penalties, and the Mayor may undertake any lawful collection efforts for any amount that such final order determines is due from any person." § 47-4312 (e).

A taxpayer may also appeal any tax assessment to the Superior Court as an alternative to filing a protest with OAH. § 47-4312 (d). The Tax Clarity Act grants the Superior Court jurisdiction over claims brought by "[a]ny person

aggrieved by any assessment of a deficiency in tax determined and assessed by the Mayor," § 47-1815.01, provided that "such person shall first pay such tax together with penalties and interest due thereon to the D.C. Treasurer."

The OAH Establishment Act confers on OAH jurisdiction "over all adjudicated cases of the Office of Tax & Revenue arising from tax protests filed pursuant to § 47-4312." § 2-1831.03 (b)(4). The Establishment Act requires taxpayers to choose either OAH or the Superior Court as the exclusive forum for tax protests:

> A person who has filed a protest of a proposed assessment under § 47-4312 and requested a hearing with [OAH] shall be deemed to have elected adjudication by the Office as the exclusive means of adjudication of all challenges to the proposed assessment, and to have waived any right to adjudication of a challenge to the proposed assessment in any other forum.

§ 2-1831.03 (j).

OTR argues that OAH has jurisdiction only over protests of a "proposed assessment" of a "deficiency, interest, or penalties against a person," pursuant

to § 47-4312 (a). OTR claims that the Shumans were requesting a tax refund rather than protesting a proposed assessment, that refunds can be ordered only by the Superior Court, and that OAH therefore lacked jurisdiction. According to OTR, "the Shumans originally challenged the March 13, 2008 Notice of Offset and asked to secure the balance of the refund they were due on their 2007 taxes," and their request for a refund and the subsequent offset notices "did not involve the proposed assessment of a deficiency, interest, or penalty."

In our view, this jurisdictional argument, first raised six months after the case came before OAH, blinks reality and exalts form over substance to an altogether unacceptable degree. The dispute engineered by OTR and its defective computer program more than three years after the fact had its origin in a purported underpayment of the Shumans' 2004 taxes, not of those to be paid in 2007. Although the original notice to the Shumans was not called an "assessment," it was in fact the first communication from OTR informing the Shumans that they allegedly owed money on their 2004 taxes. Indeed, it was "the mailing to the taxpayer of a statement of taxes due," and thus at least arguably a notice of assessment for that reason alone. *See* § 47-3303. Had OTR made the claim that the Shumans owed $790 on their 2004 return in timely fashion, there can be no

doubt that the Shumans would have had the right either to challenge the assessment before the OAH or to pay the disputed amount and sue for a refund in the Superior Court. The legislature surely could not have intended that OTR's unreasonable tardiness in asserting this claim with respect to the 2004 tax year (after having earlier acknowledged that the Shumans owed nothing for 2004) would deprive the taxpayers, who were not at fault in any way, of the most economical option available to them, i.e. to bring the matter to the attention of the agency without the expense and effort associated with taking it to court. To accept OTR's argument would be to permit the sole party which was at fault to gain an advantage from its own wrong, and to penalize the innocent parties, a result that courts, including ours, consistently endeavor to avoid. *See Glus v. Brooklyn E. Dist. Terminal,* 359 U.S. 231, 232 (1959); *J.J. v. B.A.*, 68 A.3d 721, 728 (D.C. 2003).

The ALJ analyzed this issue effectively, in part, in her order denying OTR's motion for reconsideration:

> Although OTR sent Petitioners a Notice of Offset, in essence the form was a Notice of Proposed Deficiency and not a Notice of Offset, as it related to an alleged liability for the 2004 tax year, and not an offset of a 2007 obligation against a claimed refund for that year. OTR never sent Petitioners a Notice of Proposed Deficiency

for the $790.00, which is the proper procedure to inform a taxpayer of a tax liability. Therefore, because the Notice of Offset was the first notice Petitioners received regarding the 2004 tax liability, I have construed it as a Notice of Proposed Tax Deficiency.[2]

We agree with the ALJ. OTR's argument runs afoul of the principle that "courts deal with the substance, rather than the form, of transactions." *EDM & Assocs. v. Gem Cellular*, 597 A.2d 384, 388 (D.C.1991) (citations omitted). They do not "subordinate reality to legal form," *United States v. Reading Co.*, 253 U.S. 26, 62 (1920), nor do they "permit themselves to be blinded or deceived by mere forms of law," contrary to the justice of the case. *Chicago M & St. Paul R.R.Co.*, 247 U.S. 490, 501 (1918). "Labels are not controlling," and we must be guided by "the practical consequences of the existing situation." *EDM*, 597 A.2d at 388. These principles, in our view, compel us to reject OTR's jurisdictional argument.

---

[2] The ALJ continued as follows: "All subsequent Notices of Offset Petitioners received from OTR arise out of the initial erroneous Notice of Proposed Deficiency, and thus do not end this tribunal's jurisdiction, which existed initially, and are treated as Notices of Proposed Tax deficiencies, however labeled." This conclusion is far more subject to challenge, for it is arguable that OAH's jurisdiction ceased when OTR withdrew its claim that the Shumans owed an additional amount for the 2004 tax year. See page 28, *infra*. Be that as it may, however, we entertain no doubt that OAH had jurisdiction over the Shumans' initial claim.

## B.  OAH'S REMEDIAL AUTHORITY

(1)  *General considerations.*

We turn now to the question whether the ALJ was authorized to impose the remedies that she devised.  Before addressing the statutes on which this issue turns, we make two preliminary observations.

First, our review of the order in question is not deferential.  As we explained in *Washington v. District of Columbia Dep't of Public Works*, 954 A.2d 945, 948 (D.C. 2008), the proper construction of a statute raises a question of law, and we review the order *de novo.  In re Doe*, 855 A.2d 1100, 1102 (D.C.2004); *Jackson v. United States*, 819 A.2d 963, 965 (D.C.2003) (citation omitted).  "[I]t is emphatically the province and duty of the judicial department to say what the law is . . . ." *Harris v. District of Columbia Office of Worker's Comp.*, 660 A.2d 404, 407 (D.C.1995) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803)); *see also United Parcel Serv. v. District of Columbia Dep't Emp't Servs.*, 834 A.2d 868, 871 (D.C. 2003).  Although we accord appropriate weight to the interpretation of a statute by the agency which is charged with its enforcement,

and which therefore ordinarily has subject matter expertise with respect to the matter before the court, *see Udall v. Tallman*, 380 U.S. 1, 16, (1965); *United Parcel Serv.*, 834 A.2d at 871, the OAH is vested with the responsibility for deciding administrative appeals involving a substantial number of different agencies, and it cannot fairly be expected have the degree of expertise possessed by more specialized administrative bodies. *Washington*, 954 A.2d at 948.

Second, the kind of relief ordered here, including a directive to OTR to repair or replace the computer system, to pay a substantial and continuously increasing daily fine if OTR failed to do either (in an amount that could swiftly add up to many tens of thousands of dollars if, as OTR claims, the new system could not be installed for several years and the fine continued to accumulate), and to pay more than $80,000 to another District of Columbia agency (specifically, to the agency of which the ALJ is a part) appears to be totally unprecedented. The ALJ, who obviously put a great deal of time and effort into this case, was unable, after conducting much research on the issue, to cite a single decision in which an administrative agency imposed the kinds of sanctions ordered here, and we are not aware of any comparable precedent. If we were to affirm the ALJ's decision, that would most assuredly be a "first" and might well, in our view, make administrative

law history.

We begin by stating the underlying principles that govern the issue before us. As we have noted in Part II A of this opinion, an administrative agency may not act in excess of its statutory authority. "The responsibility of determining limits of statutory grants of authority . . . is a judicial function entrusted to the courts by Congress by the statute establishing courts and marking their jurisdiction." *Stark v. Wickard*, 321 U.S. 285, 310 (1944). "Absent express statutory or regulatory authority, a regulatory agency may not impose remedial measures." *Davidson v. District of Columbia Bd. of Med.*, 562 A.2d 109, 112 (D.C. 1989) (citing *Kuflom v. District of Columbia Bureau of Motor Vehicle Servs.*, 543 A.2d 340, 346 (D.C. 1988)). In *Ramos*, 601 A.2d at 1073, in holding that an administrative agency does not have inherent authority to award punitive damages or counsel fees, we explained that

> [i]n contrast with judicial tribunals . . . administrative law tribunals — created by the legislature to serve dispute resolution and rulemaking-by-order functions within agencies of the executive branch — by definition and design do not have the inherent "equitable authority" that courts in the judicial branch have derived from common law traditions and powers. Administrative law judges only possess narrowly defined statutory and regulatory

> powers; they do not have the traditional equity power of courts to formulate remedies.

Further, an ALJ is not authorized to engage in a "balancing of interests" which reflect his or her sense of justice but which are not a part of the legislation at issue; rather, he or she must decide the case in conformity with the provisions of the statute in question, "*and nothing more.*" *District of Columbia Pres. League v. DCRA*, 646 A.2d 984, 990 (D.C. 1994) (emphasis in original).

### (2) Injunctive relief and conditional coercive fines.

In this case, the ALJ relied on three statutory provisions in support of the order that OTR repair or replace the computer program and pay a daily fine if it failed to do so: (1) § 2-1831.09 (b)(8), which authorizes an Administrative Law Judge, in any case in which he or she presides, to impose monetary sanctions for failure to comply with a lawful order; (2) § 47-4312 (c), which provides that OAH has the responsibility to decide, after providing an opportunity for a hearing, whether claimed deficiencies, or interest or penalties, are proper; and (3) § 2-1831.09 (b)(7), which empowers ALJs to "regulat[e] the parties and proceedings before them." Turning first to the last of these provisions, that authority is limited

to "what is commonly required to maintain control over aspects of the hearing process such as pleadings, discovery, testimony, and attorney behavior." *Ramos*, 601 A.2d at 1073-74. Examples of permissible exercise of such regulatory authority are found in *Mullin v. District of Columbia Rental Hous. Comm'n*, 844 A.2d 1138, 1141 (D.C. 2004), holding that the Rental Housing Commission had the power to dismiss an appeal for the plaintiff's failure to comply with a protective order, and *Brown v. District of Columbia Bd. of Zoning Adjustment*, 413 A.2d 1276, 1279-84 (D.C. 1980), in which we ruled that the BZA could properly entertain a motion to disqualify an attorney who had allegedly violated a disciplinary rule. We cannot agree with the ALJ's suggestion that the relief granted in this case, including coercive conditional daily fines, "regulates the parties and proceedings" within the meaning of § 2-1831.09 (b)(7).

Section 47-4312 (c), which directs OAH to determine whether a taxpayer's protest of an assessment has merit, likewise provides scant support for the ALJ's ruling. Although the ALJ may – indeed, she must – make this limited determination, the statute does not state that the ALJ is also authorized to ensure more accurate future assessments, or to remedy any possible future recurrences. Indeed, assuming *dubitante* that OAH's jurisdiction over the 2004 return continued

after the agency initially confessed error, see note 2, *supra,* there is nothing in this provision that could reasonably be construed as authorizing what was in effect injunctive relief against OTR or the contempt-type relief that followed. While the statute provides that OAH's decision shall operate as a final assessment upon which OTR may undertake tax collection efforts, § 47-4312 (e), there is no provision permitting OAH to enjoin OTR to ensure future compliance. In addition, nothing in the OAH Establishment Act expands the agency's authority to permit it to impose remedial measures of the kind at issue here. *See* § 2-1831.09 (b). The case must therefore turn on whether or not the *de facto* injunctions, and the conditional fines that followed, can be justified as remedies for failure by OTR to comply with what OAH claims to have been lawful orders. We conclude that they cannot.

The ALJ apparently recognized that she was not authorized to grant equitable relief, but she insisted that she had not done so. In her order denying reconsideration, she wrote that she had ordered a monthly sanction for every month that OTR did not comply with a lawful order, and that "because OTR testified [sic] that compliance can only be secured by fixing its computer system, it logically follows OTR must fix its computer system in order to comply with the lawful

order." Therefore, according to the ALJ, "the requirement for OTR to fix its computer system does not exceed this court's authority by granting equitable relief. Instead, the requirement is necessary to regulate the proceedings of this case." *Id*. But viewing the substance rather than the form of what was done, *EDM*, 597 A.2d at 385, we must reject the notion that an order directing OTR to repair or replace the computer system, followed by sanctions which, as we shall see, were consistent with a judgment of civil contempt, did not constitute equitable relief. Reality, not nomenclature, must control. We hold that for all practical purposes, the ALJ issued injunctions, both by ordering OTR not to send the Shumans, in the future, any further claims of underpayment of their 2004 tax and by effectively ordering OTR to repair or replace its computer system.

If, as we have held, the ALJ was without authority to enjoin OTR, it follows *a fortiori*, that it was impermissible for her to impose financial penalties in order to compel compliance with the injunctions. Because, by the terms of the judge's order imposing sanctions, OTR would be subject to coercive monthly fines until it complied with the injunction, that order was, in all but name, a judgment for civil contempt, from which OTR could purge itself only by compliance. *See, e.g.*, *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949); *Langley v.*

*Kornegay*, 620 A. 2d 865, 866-67 (D.C. 1993). Indeed, in her Final Order on Sanctions, the ALJ discussed civil contempt precedents in considerable detail, and she concluded that "the imposition of an ongoing monetary sanction on OTR is the only effective means of forcing compliance with this court's order," and that it was "important to motivate OTR to comply with future orders as well as deterring its past continuing errors."

The ALJ failed to acknowledge, however, that only judicial courts, and not administrative agencies, have the authority to issue contempt sanctions. "[T]he power to cite for contempt has never been put directly into the hands of a federal agency; rather the assistance of a federal court is obtained and its contempt power enlisted in support of the agency by 'enforcement' of the subpoena or order." *Use of Contempt Power to Enforce Subpoenas and Orders of Administrative Agencies*, 71 Harv. L. Rev. 1541, 1541-42 (1958). As the Supreme Court explained more than a century ago in *Interstate Commerce Comm'n v. Brimson*, 154 U.S. 447, 485 (1894) (*abrogated on other grounds, Bloom v. Illinois,* 391 U.S. 194, 198-200 (1968)), an agency may not, "under our system of government, and consistently with due process of law, be invested with authority to compel obedience to its orders by a judgment of fine or imprisonment." With exceptions not here relevant,

"the power to impose fine or imprisonment in order to compel the performance of a legal duty imposed by the United States can only be exerted, under the law of the land, by a competent judicial tribunal having jurisdiction in the premises." *Brimson*, 154 U.S. at 485 (citations omitted).

Relying on *Brimson*, the federal appellate courts have consistently recognized this "well-established principle." *See Atlantic-Richfield Co.* ("ARCO") *v. United States Dep't of Energy*, 769 F.2d 771, 793 (D.C. Cir. 1984) *N.L.R.B. v. Interbake Foods, LLC*, 637 F.3d 492, 497 (4th Cir. 2011); *United States v. Tennessee Air Pollution Control Bd.*, 185 F.3d 529, 532 n.3 (6th Cir. 1999); *Matter of Hipp, Inc.*, 895 F.2d 1503, 1515 (5th Cir. 1990); *N.L.R.B. v. Int'l Medication Sys., Ltd.*, 640 F.2d 1110, 1115-16 (9th Cir. 1981); *In re Grand Jury Proceedings*, 486 F.2d 85, 90 (3d Cir. 1973); *Shasta Minerals & Chemical Co. v. Securities and Exchange Comm'n*, 328 F.2d 285, 286 (10th Cir. 1964); *Sullivan v. Union Stockyards Co. of Omaha*, 26 F.2d 60, 61 (8th Cir. 1928). We discern no reason to do otherwise, and we think it inconceivable that by enacting § 2-1831.09 (b), the legislature intended to abrogate such a well-established and constitutionally based principle, at least arguably in contravention of the constitutional separation of powers.

Here, OAH sought to impose increasing coercive fines for every month that OTR did not repair or replace its computer system. These sanctions sound in civil contempt, they were based on the ALJ's analysis of the law of civil contempt, and they go far beyond any relief that an administrative agency, as opposed to a court, is authorized to issue. The appropriate forum for a suit to compel compliance with an order of OAH is the Superior Court. Indeed, the OAH Establishment Act, § 2-1831.09 (e) provides that "[i]n addition to any other sanctions that an [ALJ] may lawfully impose for the violation of any order . . . , an [ALJ], or a party in interest in an adjudicated case, may apply to any judge of the Superior Court of the District of Columbia for an order issued on an expedited basis to show cause why a person should not be held in civil contempt for refusal to comply with an order . . . issued by an [ALJ]."

If the Shumans wished to pursue this kind of relief, then a "competent judicial tribunal," *ARCO*, 769 F. 2d at 993, was and (subject to any possible defenses) remains, readily available.

(3) *The $80,835.46 award*

In addition to the civil contempt-style conditional coercive fines, the ALJ ordered that OTR be "sanctioned in the amount of $80,825.26, payable to this administrative court, with interest accruing as allowed by law." She imposed this sanction because

> OTR's conduct has created prejudice to the judicial system. This court wasted judicial resources[3] by conducting multiple status conferences and hearings on Orders to Show Cause after the original "Final" Order. Scheduling and conducting these hearings on this matter, solely because OTR failed to comply, delayed innocent litigants in other matters from litigating their claims. Long after February 2009, when proceedings in this case should have ended, this court has expended significant resources in the continued adjudication of this case because OTR failed to comply with court orders. In addition, [the Shumans] expended time and resources not only in litigating this case, but also in receiving and deciphering their Federal and state tax consequences due to OTR's negligence.

The ALJ found that the amount of this sanction "represents the amount of money OTR erroneously claimed in Notices of Offset or distributed to [the Shumans] in

---

[3] Again, the ALJ appeared to equate administrative proceedings with the judicial process.

erroneous checks, all regarding the 2004 tax year." How, if at all, this correlates to wasted OAH resources is unclear.

The only precedents cited by the ALJ for this very substantial sanction are three decisions by United States District Courts in which the amounts awarded were minimal in comparison to the more than $80,000 at issue here. *See Olga's Kitchen of Hayward, Inc. v. Papo*, 108 F.R.D. 695, 711 (E.D. Mich. 1985), *aff'd in part & rev'd in part on other grounds,* 1987 U.S. App. LEXIS 2205 (6th Cir.1987) ($1000 to be paid to Clerk of the Court for the unnecessary consumption of judicial resources etc.); *Itel Containers Int'l. Corp. v. Puerto Rico Marine Mgmt., Inc.*, 108 F.R.D. 96, 106-07 (D.N.J. 1985) (sanction of $5000 to be paid to the government for the abuse of the judicial process as it directly impacted upon the court; the court stated, however, that if, on appeal, an award of $5000 was deemed excessive, "it would appear that no less than $500 would be appropriate); *Nat'l Ass'n of Radiation Survivors v. Turnage,* 115 F.R.D. 543, 549 (N.D. Cal. 1987) (defendant was originally ordered to pay an additional sum of $15,000 "for the unnecessary consumption of the court's time"; this sum was initially to "compensate unpaid law students who assist in the work of the courts of this district," but the court subsequently ordered that the payment be made instead to the clerk of the court, so

that the funds could be paid into the Treasury of the United States). Based on these decisions, the ALJ evidently assumed that if United States District Courts had the authority to order payments such as those described above, an ALJ was authorized not only to do so but, in an appropriate case, to make the sanction many times greater. The ALJ has not addressed at all the possibility that courts are authorized to take certain remedial actions that administrative agencies may not, and that the proper disposition of this petition for review may well turn on the difference.

This case also differs from those relied upon by the ALJ in that the sanction in question would require the transfer of more than $80,000 from one District of Columbia agency to a second, by order of the proposed recipient agency. OTR has not focused upon the propriety of OAH's decreeing a payment to itself, and the ALJ apparently did not believe that a reasonable person might regard her presiding over the case, and imposing a sanction substantially adding to the funds available to her own agency, as raising a question as to whether the appearance of impartiality had been maintained. *See, generally*, *Scott v. United States*, 559 A.2d 745, 749 (D.C. 1989) (en banc). This problem is further complicated by the fact that in this court the Shumans' participation in the case has been minimal, so that most of the disputation has been between the ALJ and counsel for OTR. The

question regarding any possible appearance of partiality has not been adequately briefed, however, and although we alert the parties to its existence, we do not base our decision upon that ground.

Because the question now under discussion, unlike those involving injunctive relief and coercive conditional sanctions, is not essentially equitable in nature, and because § 2-1831.09 (b)(8) authorizes the imposition of monetary sanctions for violation of a lawful order, we are not prepared to rule that the *Brimson* line of authority will bar an award for unnecessary consumption of judicial resources in every case. The decisive question, however, is whether the underlying orders, enjoining OTR from sending future incorrect notices, were "lawful." Although it may not appear unreasonable for an agency charged with determining whether a proposed assessment was proper to have the authority, when incorrect notices are thereafter issued repeatedly, to order the cessation of such conduct, there is nothing in § 47-4312 (c) permitting the OAH to enjoin future actions on the part of OTR. The taxpayers are not without a remedy in such a situation, for the Superior Court can assuredly issue equitable relief in an appropriate case. Accordingly, we are constrained to hold that the unconditional award of $80,825.06 cannot be sustained as a permissible monetary sanction for

violation of lawful orders.

We caution, as we did at the outset of this opinion, that our reversal of the ALJ's order is not intended to suggest that OTR's handling of this matter was justifiable, or that responsibility for what occurred can be excused as the fault of the computer program but not of OTR. The problem in this case was not necessarily any substantive weakness, but rather the fact that critical issues were being argued in the wrong forum. Although they may be frustrating to lay persons, such considerations matter.

## IV. CONCLUSION

For the foregoing reasons, the decision of the OAH is reversed and the Shumans' action is dismissed, without prejudice to further proceedings by the Shumans in the Superior Court or to any defenses that may be presented in that court. Further, in the interests of justice, and although OTR has technically prevailed in its Petition for Review, the District of Columbia shall not recover from the Shumans the costs of these proceedings or any portion thereof.